[No. H002317. Sixth Dist. Apr. 18, 1990.]

DANIEL WALLIS et al., Plaintiffs and Appellants, v.
FARMERS GROUP, INC., et al., Defendants and Appellants.

722

[black redaction bars]

## COUNSEL

Lerner & Veit, Jon S. Heim, Eric C. Shaw, Thoits, Love, Hershberger & McClean and William J. McClean for Plaintiffs and Appellants.

Horvitz & Levy, Barry R. Levy, Daniel Gonzalez, Mitchell & Stock and Laurence B. Mitchell for Defendants and Appellants.

## OPINION

**COTTLE, J.**—Marcia Wallis (Marcia) sued Farmers Group, Inc., and related entities (Farmers) after Farmers terminated her as an insurance agent, and Daniel Wallis (Daniel) sued Farmers after Farmers refused to approve the sale of his agency to Marcia.[1] Prior to trial, Farmers brought an *in limine* motion seeking to exclude parol evidence to interpret a written agreement between Farmers and Marcia. Following an evidentiary hearing, the trial court denied Farmers' motion and the matter proceeded to trial. A jury found that Farmers terminated Marcia without good cause and rendered a verdict in favor of Marcia on theories of breach of contract, tortious breach of the contractual covenant of good faith and fair dealing, and fraud. It awarded her $240,000 in compensatory damages and an additional $4,500 for emotional distress and $200,000 in punitive damages under the tortious breach and fraud theories. The jury also rendered a verdict in favor of Daniel on a breach of contract theory and awarded him $175,000 in compensatory damages. The trial court rendered judgment accordingly. In posttrial proceedings, the trial court granted Farmers a conditional new trial on the issue of damages as to Daniel's cause of action subject to Daniel's acceptance of a remitted judgment in the sum of $30,316, and struck from plaintiffs' memorandum of costs the sum of $169,951 claimed for attorney's fees.

---

[1] For convenience, we adopt the parties' method of referring to the plaintiffs by their first names.

 Farmers appeals from the judgment in favor of Marcia.[2] For reasons we shall explain, we reverse the judgment with respect to the tort claims and affirm it as to the contract claim.

Daniel cross-appeals from the order granting Farmers a conditional new trial, and Daniel and Marcia cross-appeal from the order striking attorney's fees from their memorandum of costs. We shall affirm both orders.

## BACKGROUND[3]

On May 11, 1978, Marcia entered into a written agent appointment agreement (agreement) with Farmers. The agreement is a standard form contract used by Farmers with its career agents who sell insurance exclusively for Farmers.[4] Farmers' agents are independent contractors who sell Farmers' insurance policies out of their own offices. Under the agreement, an agent is not precluded from selling another company's insurance if Farmers does not underwrite that particular kind of insurance or declines coverage to a prospective insured.

On July 19, 1979, Daniel entered into an identical agreement with Farmers.

---

[2] Farmers also appealed from the judgment in favor of Daniel, orders denying its motions for judgment notwithstanding the verdict as to both Marcia and Daniel, and the order granting a conditional new trial insofar as a new trial was unconditionally denied. Farmers raises no issues concerning its appeals as to the judgment in favor of Daniel and the orders denying its motions for judgment notwithstanding the verdict. We therefore treat the points as waived. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 479, p. 469.) An order denying a motion for a new trial is nonappealable. (*Id.*, § 92, p. 113.) We therefore dismiss Farmers' appeal from the order denying its motion for a new trial with respect to Daniel's cause of action.

[3] A substantial portion of the parties' presentation at trial concerned Farmers' reasons for terminating Marcia and refusing to approve Daniel's proposed sale to Marcia. The details of these matters are not directly pertinent to our analysis. We therefore summarize the background of this case only to the extent necessary. We note that the facts are essentially undisputed.

[4] The agreement contains 10 separate provisions. The first relates to Farmers' obligations to pay commissions according to commission schedules established by Farmers and in effect on the effective date of a commission transaction, arrange medical insurance, provide manuals and forms, provide advertising assistance, and make available education and training programs; the second specifies four obligations of an agent in connection with selling Farmers' policies; the third provides three methods by which the agreement may be terminated; the fourth sets forth a procedure by which an agent can request review of a termination; the fifth provides for certain payments to the agent in the event of termination; the sixth provides for transfer of the agency business from the agent to another; the seventh outlines a formula for calculating the value of an agency; the eighth states a procedure for transfer of an agency and payment therefor; the ninth affirms that an agent is an independent contractor; and the tenth states that the agreement supersedes other agreements and may not be modified other than by a writing.

An insurance agent earns commissions from the sale and renewal of policies. Thus, as an insurance agent builds his agency, or "book of business," the potential of renewal commissions gives economic value to the business.

The agreement specifies a formula for calculating the "contract value" of an agency based upon service commissions paid to the agent in the preceding six or twelve months, the number of active policies attributable to the agent, and the number of years of continuous agent service. The agreement further provides that upon termination of the agreement Farmers will pay the agent the contract value of the agency or, if it does not, the agent can sell the agency to an acceptable purchaser for not more than the contract value.[5]

A separate provision of the agreement conditionally permits an agent to sell his business to a family member. This term states: "The Agent or the Agent's heirs may sell all or any part of this Agency to a member(s) of the Agent's immediate family at any time, provided the purchaser is acceptable to [Farmers], and provided the sale price does not exceed the proportionate share of the 'Contract Value' (as hereinafter defined) of the Agency." The agreement further provides: "The Agent agrees to transfer and assign all of the Agent's interest under this Agreement and Agency (including any interest in the telephone numbers and leased or rented office location) to [Farmers] or any other purchaser in the event they make payment to the Agent pursuant to [the contract value provision]. For the payment received, the Agent further agrees that for a period of one year following the date of sale the Agent will neither directly nor indirectly solicit, accept, or service the insurance business of any policyholder of record in the agencies of this district as of the date of sale. The Agent acknowledges that all manuals, lists and records of any kind (including information pertaining to policyholders and expirations) are the confidential property of [Farmers] and agrees they shall not be used or divulged in any way detrimental to [Farmers] and shall be returned to [Farmers] upon termination of the Agency."

Marcia and Daniel shared an office and built their respective agencies to the point where Marcia earned approximately $54,000 for the year 1984 through the month of October and Daniel earned approximately $25,000 for the year 1984 through the month of June. Their annual expenses were approximately $50,000.

---

[5] The agent also has the option of refusing contract value, retaining ownership of his or her business, and competing with Farmers. (*Heston* v. *Farmers Ins. Group* (1984) 160 Cal.App.3d 402, 415 [206 Cal.Rptr. 585].) Marcia elected this option after Farmers terminated the agreement.

The majority of Daniel's business was generated from automobile lot referrals. In the spring of 1984, Farmers announced that it would no longer sell insurance to individuals referred to its agents from automobile lots. Daniel decided to leave Farmers and sought an appointment as a Safeco agent. He also entered into a contract to sell his agency to Marcia. Farmers learned of Daniel's intentions and communicated to Marcia and Daniel that, if Daniel was appointed by Safeco, a conflict of interest would arise and it would therefore refuse to accept Marcia as a purchaser of Daniel's agency and terminate Marcia's agency.[6]

Daniel terminated his agency in June 1984 and contracted with Marcia to sell his business to her. Farmers wrote Daniel that Marcia was unacceptable as a purchaser. On July 10, William Dierker, Farmers' Division Agency Manager, telephoned Marcia to make an appointment to pick up Daniel's files. Marcia protested that the files belonged to her. Dierker replied that Marcia would be terminated if she failed to release the files. Dierker arrived at Marcia's office on July 12 to pick up the files. Marcia handed him a letter from her attorney which indicated that Marcia would deliver the files subject to the right to litigate ownership. Marcia delivered the files. Dierker then stated that Marcia would be treated fairly and not be terminated.

Marcia and Daniel filed this action on July 17, 1984, alleging breach of contract and other theories of liability arising from Farmers' refusal to accept Marcia as a purchaser of Daniel's agency.

On August 1, 1984, Farmers terminated the agreement between it and Marcia by invoking a three months' termination clause. The complaint in this case was then amended to include theories of liability arising from Farmers' termination of Marcia.

---

[6] The evidence at trial is subject to the inference that Daniel was, in fact, planning to use his relationship with Marcia to access for his own benefit to the detriment of Farmers information which the agreement specified was confidential. Unknown to Farmers until the discovery phase of this litigation, Daniel dictated and Marcia transcribed a document entitled "Marketing Strategy for Safeco." Daniel gave this document to Safeco in May, 1984. The document states, in part: "What is Safeco going to get from me? I have access to over 500 [Farmers automobile] policies from my wifes [sic] book of business that qualify or will qualify for Safeco. They were put in [a Farmers company] because they had no prior liability. After one years [sic] period of time I can go after [these policies]. [¶] People that are referred to me are referred to Dan Wallis not Farmers Insurance. [¶] I will quote all of Marcia's Farmers renewals and try to place them with Safeco. Again, after a year I will go after my Farmers policies." At trial Daniel denied he intended to use the information in Marcia's possession to appropriate business Marcia placed with Farmers. He explained that the purpose of the marketing strategy document was merely to interest Safeco in himself.

## FARMERS' APPEAL

### A. *Marcia's Breach of Contract Claim*

Farmers contends that its agent appointment agreement, which permits termination by either party on three months' notice, was an integrated document and, consequently, it was error to admit extrinsic evidence contradicting the terms of the agreement and demonstrating the contract between Farmers and plaintiff included an implied requirement of good cause for termination. Farmers also claims that if good cause were required to terminate Marcia's agency, then her conflict of interest with Farmers provided the necessary cause.

### *The Parol Evidence Issue*

Preliminarily we note that in reviewing a trial court's interpretation of a written instrument where no conflicting extrinsic evidence is received, an appellate court is not bound by the lower court's ruling but must give the writing its own independent interpretation. (*Delucchi* v. *County of Santa Cruz* (1986) 179 Cal.App.3d 814, 820-821 [225 Cal.Rptr. 43].)

In the present case, the trial court determined the agent appointment agreement was "a partially integrated agreement as to those terms set forth, . . . the partially integrated agreement does not cover the issue of cause on a . . . three-month notice termination" and therefore the "terms of the partially integrated writing may be explained or supplemented with evidence of consistent additional terms." Our review of the agent appointment agreement leads us to the same conclusion.

"The parol evidence rule generally prohibits the introduction of any extrinsic evidence to vary or contradict the terms of an integrated written instrument. [Citation.] It is based upon the premise that the written instrument *is* the agreement of the parties. [Citation.] Its application involves a two-part analysis: 1) was the writing intended to be an integration, i.e., a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements [citation]; and 2) is the agreement susceptible of the meaning contended for by the party offering the evidence? [Citation.]" (*Gerdlund* v. *Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 270 [235 Cal.Rptr. 279].)

Was the agent appointment agreement intended to be a complete and final expression of the parties' agreement? We think not. For example, it does not cover how commissions will be paid or earned, unquestionably an important factor in the employment or independent contractor

relationship. Additionally, it does not contain an integration clause indicating it constitutes the *entire* understanding of the parties. (Compare, e.g., *Gerdlund* v. *Electronic Dispensers International, supra*, 190 Cal.App.3d at p. 268. [That contract provided: "THE AGREEMENT COMPLETE. [¶] This agreement contains the entire agreement between the Company and the Representative. There are no oral or collateral agreements of any kind. . ."].) On the contrary, it provides that "existing written addendums to such . . . Agreement and/or any other existing supplementary written agreements . . . shall remain in force . . . ." From the foregoing, it is clear that neither Farmers nor Marcia considered the agreement to be the complete and final embodiment of the terms of their relationship.

Nevertheless, the agreement exhaustively covers the subject of termination and even provides for a termination review procedure. Both parties concede that no other written material discusses the subject. Where, as here, a writing is intended by the parties as a final expression of their agreement *with respect to a particular subject matter* or term, the writing is integrated as to those terms which "may be explained or supplemented by course of dealing or usage of trade or by course of performance." (Code Civ. Proc., § 1856, subd. (c).) ■ "When only part of the agreement is integrated, the [parol evidence] rule applies to that part, but [extrinsic] evidence may be used to prove elements of the agreement not reduced to writing. [Citations.]" (*Masterson* v. *Sine* (1968) 68 Cal.2d 222, 225 [65 Cal.Rptr. 545, 436 P.2d 561].) ■ We conclude that while the agreement as a whole was not integrated, it was integrated with respect to the subject of termination.

We now move to the second part of our analysis: is the agreement susceptible of the meaning urged by the party offering the evidence? The provision permitting termination upon three months' notice is silent as to whether good cause is required, stating simply that the agreement "may be terminated by either the Agent or [Farmers] on three (3) months written notice." Farmers contends that this means that no cause is required to invoke the three month termination procedure. Marcia, on the other hand, contends that Farmers had both an express oral agreement and an implied-in-fact agreement that she would be discharged only for cause.[7] We determine that

---

[7] In her complaint, Marcia alleged that "defendants promised that plaintiff's appointment as an insurance agent would continue indefinitely, that defendants and their agents and employees would not act arbitrarily in dealing with plaintiff, and that plaintiff's position as one of defendants' insurance agents would not be terminated except for good, just and legitimate cause or reason. Said promises were made expressly to plaintiff by defendants, both at the time of plaintiff's initial appointment as an insurance agent and thereafter, and were implied by the conduct and activities of defendants and their agents and employees. In particular, said promises were implied in the content of defendants' personnel policies and practices, by the longevity and continued nature of plaintiff's role as one of defendants' insurance agents, by the actions of defendants and their agents and employees in consistently rating plaintiff's

the language of the parties' agreement was reasonably susceptible of either of these meanings. Consequently, extrinsic evidence was admissible to ascertain the meaning of the written instrument. (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)[8]

■ Labor Code section 2922 establishes a presumption of at-will employment where the parties have made no oral or written agreement specifying the length of employment or the grounds for termination. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 677 [254 Cal.Rptr. 211, 765 P.2d 373].) This presumption, however, may be rebutted by extrinsic evidence of an implied agreement that the employment relationship will continue indefinitely, pending the occurrence of some event such as the employer's dissatisfaction with the employee's services or the existence of some "cause" for termination. (*Pugh* v. *See's Candies, Inc.* (1988) 203 Cal.App.3d 743, 751 [250 Cal.Rptr. 195].)

■ The evidence Marcia offered to demonstrate the existence of an implied-in-fact requirement of good cause for termination was provided primarily through the deposition testimony of Farmers' officers.[9] Gary McCarter, its regional manager, stated that, as long as he knew, the policy of Farmers was that no agent was ever terminated without cause. William Braddock, a vice-president of sales, replied, "well, certainly" when asked: "But you tried to have a good reason to terminate somebody before you

performance satisfactory or better, and issuing commendations to plaintiff for job performance, all of which, together with the communications of defendants' agents and employees in connection therewith reflect defendants' assurances that plaintiff would continue as one of defendants' insurance agents, unless there was good, just and legitimate cause or reason for her termination."

[8]Several appeal courts, confronted with termination clauses similar to the one before this court, have allowed in extrinsic evidence after finding the clauses reasonably susceptible to an interpretation requiring good cause for termination. (See, e.g., *Bert G. Gianelli Distributing Co.* v. *Beck & Co.* (1985) 172 Cal.App.3d 1020, 1037 [219 Cal.Rptr. 203] [termination clause read: "This agreement will continue in effect unless and until terminated . . . by thirty days written notice by either party to the other."]; *Sherman* v. *Mutual Benefit Life Ins. Co.* (1980) 633 F.2d 782, 783 [termination clause read: " '*Basis of Termination.* This Agreement may be terminated at any time by either party, by giving the other sixty days' notice to that effect; or it may be terminated immediately by the Company if in its judgment its interests so require.' "]; *Brawthen* v. *H & R Block, Inc.* (1972) 28 Cal.App.3d 131, 134 [104 Cal.Rptr. 486] [contract provided for automatic renewal from year to year " 'unless either party gives written notice of termination ninety days prior to renewal date.' "])

[9]Marcia also argued that Farmers had an express oral agreement that it could terminate her only for "[t]he five reasons on the contract: embezzlement, switching insurance, abandonment of the agency, conviction of a felony, and willful misrepresentation." Her testimony on this point, however, must be disregarded because it contradicts an express provision of the agent appointment agreement which gives Farmers the right to terminate not only for the five listed reasons but also, on one month's notice, for other breaches of the agreement and, on three months' notice, for further reasons (or possibly for no reason at all).

terminated them?" Another vice-president of sales, Morris Samuels, stated that Farmers does not make a practice of terminating agents without cause and has a policy to have cause when it terminates an agent. Martin Feinstein, a director of sales support, stated that he believed Farmers always had a reason when it terminated an agent and replied "Not to my knowledge" when asked whether Farmers terminated agents without good cause.

Feinstein opined that the drafters of Farmers' January 1977 agency appointment agreement intentionally omitted from the form a provision stating whether good cause was required for termination. An earlier form, introduced in 1965, provided: "This Agreement and the Agencies created hereby shall terminate upon the death of the AGENT, and may be cancelled without cause by either the AGENT or [Farmers] on 30 days' written notice." Feinstein stated: "I think the writers of the contract left the cause out, the statement about cause out when they rewrote the contract and included the rights to the termination review board hearing and extended the period of time from thirty days to ninety days."

Marcia argued to the jury that the presence of the words "without cause" in the 1965 form and the absence of such words in the 1977 form was significant. In substance, she argued the fact that Farmers "removed" the words "without cause" from the 1977 form implied that the agreement at issue required good cause to invoke the three months' termination clause.

Marcia also pointed out that if the provision for termination upon three months' notice does not require good cause for its invocation, then the agreement's termination review procedure is rendered meaningless. That provision provides: "In the event this Agreement is terminated by [Farmers], the Agent may within ten (10) days of receiving the notice of termination request a review of the termination by a termination review board. [¶] The termination review board will be composed of [a Farmers agent selected by the Agent, the Regional Manager, and a third party mutually selected by the other two]. . . . [¶] The Board will submit a summary of the hearing and its recommendations to the Executive Home Office. [¶] The chief executive officer and staff will review the summary and recommendations, reach a decision and promptly advise the Agent of that decision." If no cause were required to invoke the three-month termination clause, Marcia argued, then a board reviewing the termination would only need to count the days rather than conduct a substantive review.

*The Good Cause Issue*

 Having determined that parol evidence was admissible, we next consider whether the evidence supports the jury's verdict—first, that good

cause was required and, second, that Farmers did not have it. ■ We begin by observing that, on appeal, all factual matters will be viewed most favorably to the prevailing party and in support of the judgment. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480].) The determination of the trier of fact will be binding on appeal "unless the contrary conclusion is the only one that can reasonably be drawn from the evidence." (*Mehl* v. *People* ex rel. *Dept. Pub. Wks.* (1975) 13 Cal.3d 710, 715-716 [119 Cal.Rptr. 625, 532 P.2d 489].) ■ Applying this standard, it is clear that the evidence presented at trial—in particular the evidence that Farmers officers themselves believed that good cause was required—was sufficient to support the finding of an implied-in-fact promise that Marcia would not be terminated without cause.

The more difficult question is whether Farmers' motives in this case satisfied the good cause requirement. According to *Pugh* v. *See's Candies, Inc., supra,* 203 Cal.App.3d at page 752, good cause for termination of employment connotes a fair and honest cause or reason, regulated by good faith on the part of the employer. At trial, Farmers presented evidence that as early as March 1984 (three months before Daniel left Farmers), Farmers management was soliciting advice on how to resolve conflict of interest situations "where our agent shares an office or is married to an independent insurance broker." This memo was followed by another in May 1984 in which Farmers' regional manager announced that "[s]ituations wherein a spouse is licensed with another company and the other spouse is licensed with Farmers will be considered a conflict of interest." Farmers points out that numerous courts, including this one, have held that " '[t]here is no more elemental cause for discharge of an employee than disloyalty to his employer.' " (*Fowler* v. *Varian Associates, Inc.* (1987) 196 Cal.App.3d 34, 43 [241 Cal.Rptr. 539], quoting *Labor Board* v. *Electrical Workers* (1953) 346 U.S. 464, 472 [98 L.Ed. 195, 74 S.Ct. 172].)

While we agree that the conflict of interest situation might have provided sufficient cause to justify Marcia's termination, we cannot declare so as a matter of law. ■ If the evidence is uncontradicted and permits only one conclusion, then the issue is legal, not factual. (*County of Los Angeles* v. *Kranz* (1977) 65 Cal.App.3d 656, 659 [135 Cal.Rptr. 473].) Where, however, as here, the evidence is contradicted, the issue is one for the trier of fact to decide. In the present case, the jury accepted Marcia's contention that Farmers terminated her because she filed a lawsuit against them and it rejected Farmers' contention that the termination was for a conflict of interest. As noted earlier, the determination of the trier of fact is binding on appeal "unless the contrary conclusion is the only one that can reasonably be drawn from the evidence." (*Mehl* v. *People* ex rel. *Dept. Pub. Wks., supra,* 13 Cal.3d at pp. 715-716.) ■ We conclude that substantial evi-

dence supports the jury's finding that Farmers lacked good cause for terminating Marcia's agency.

### B. *Marcia's Tortious Breach of the Covenant of Good Faith and Fair Dealing Claim*

 With regard to Marcia's second theory, *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, 700, has done away with any cause of action for a tortious breach of the implied covenant of good faith and fair dealing as an independent source of job security. *Foley* is retroactive. (*Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973 [258 Cal.Rptr. 592, 772 P.2d 1059].)

### C. *Marcia's Fraud Claim*

Marcia's fraud theory is predicated upon Dierker's statements and actions. Marcia summarizes this claim as follows: "Viewing Marcia's conversations with Dierker on July 10 and 12 in their entirety and in context, the jury reasonably could conclude that: 1) Dierker said that if the files were not turned over, Marcia would be terminated; 2) Marcia properly viewed this as a threat to her job, to which her attorney referred in the letter; 3) Marcia was told that if she did cooperate and turn over the files she would be treated fairly like any other Farmers agent and would not be terminated; and 4) Dierker was allowed to leave with the files on July 12 because he confirmed Marcia would not be terminated. Accordingly, the jury could conclude that Marcia turned over the files only in reliance on statements, ultimately false, that she would keep her job."

 In an action for fraud, damage is an essential element of the cause of action. (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 219 [197 Cal.Rptr. 783, 673 P.2d 660].) We conclude that Marcia has suffered no legal injury as a consequence of Dierker's statements and actions.

The agreement between Farmers and Daniel specified that Daniel's files belonged to Farmers and were to be returned to Farmers upon termination of the agreement. Daniel terminated the agreement. Farmers was accordingly entitled to Daniel's files. Marcia was entitled to Daniel's files only if Farmers approved her as Daniel's transferee. Farmers did not do so. Thus, in turning over Daniel's files to Farmers, Marcia did what she was legally obligated to do. Her reason for doing so is irrelevant. It is axiomatic that performance of a legal obligation cannot constitute a legal injury. (Cf. *Abbot* v. *Stevens* (1955) 133 Cal.App.2d 242, 247 [284 P.2d 159] [payment of a

lawful exaction cannot constitute a legal injury].) Thus, Marcia's fraud theory necessarily fails.

## D. *Exhaustion of Administrative Remedies*

On appeal, Farmers invokes for the first time the doctrine of exhaustion of administrative remedies (the termination review board procedure) to bar Marcia's action. We hold that Farmers' failure to raise this issue below precludes it from raising it on appeal.

We begin by pointing out that as a general rule, "where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act." (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 292 [109 P.2d 942, 132 A.L.R. 715].) An analogous rule applies to situations where, as here, a plaintiff has an internal remedy for adjusting grievances and fails to pursue it before seeking judicial relief. (*American Society of Composers, Authors & Publishers* v. *Superior Court* (1962) 207 Cal.App.2d 676, 684 [24 Cal.Rptr. 772].)

The question of whether failure to exhaust administrative or internal remedies is jurisdictional, however, is a matter of some debate.[10] We believe that the correct rule was that stated in *Green* v. *City of Oceanside, supra,* 194 Cal.App.3d 212, i.e., that the doctrine of exhaustion of remedies does not implicate subject matter jurisdiction (which may not be waived and which can be raised for the first time on appeal) but "rather is 'a procedural prerequisite' 'originally devised for convenience and efficiency' and now 'followed under the doctrine of *stare decisis.* ' " *(Id.* at p. 222.) It is jurisdictional only in the sense that a court's failure to apply the rule in a situation where the issue has been properly raised can be corrected by the issuance of a writ of prohibition. (*Ibid*.)

As the court stated in *Green*, exhaustion "is not the sort of issue which should fall outside the general rule of civil litigation that arguments and objections not raised and preserved in the trial court are waived on appeal. . . . We think it would be grossly unfair to allow a defendant to ignore this potential procedural defense at a time when facts and memories

---

[10]Opinions holding that it is include *American Society of Composers, Authors & Publishers* v. *Superior Court, supra*, 207 Cal.App.2d 676 and *Jacobs* v. *Retail Clerks Union, Local 1222* (1975) 49 Cal.App.3d 959, 963 [123 Cal.Rptr. 309]. Opinions holding that it is not include *Green* v. *City of Oceanside* (1987) 194 Cal.App.3d 212 [239 Cal.Rptr. 470], disapproved on another ground in *Kemmerer* v. *County of Fresno* (1988) 200 Cal.App.3d 1426, 1434, footnote 3 [246 Cal.Rptr. 609], and *Doster* v. *County of San Diego* (1988) 203 Cal.App.3d 257, 260 [251 Cal.Rptr. 507].

were fresh and put a plaintiff to the time and expense of a full trial, knowing it could assert the failure to exhaust administrative remedies if it received an adverse jury verdict. The exhaustion doctrine is simply a 'procedural prerequisite'. . . [Citation.]" (194 Cal.App.3d at pp. 222-223.)

Accordingly, we hold that Marcia's failure to invoke the termination review board procedure does not preclude her action at law.

### E. *Alleged Instructional Error*

 Farmers contends that it should be entitled to a new trial because of alleged instructional error. The first of these was the court's refusal to instruct the jury, as requested by Farmers, that when an insurance sales agent occupies a sensitive or confidential position, the company must of necessity be allowed substantial scope for the exercise of subjective judgment in deciding whether to terminate for conflict of interest.

We see no error in the court's refusal to give this instruction. While the law is settled that where " 'the employee occupies a sensitive managerial or confidential position, the employer must of necessity be allowed substantial scope for the exercise of subjective judgment' " (*Pugh* v. *See's Candies, supra*, 203 Cal.App.3d at p. 761), this case is not about an employee who occupies a sensitive managerial or confidential position. Indeed, this case is not about an employee at all. Marcia's only connection with Farmers was as an independent contractor.

 Farmers next argues that the trial court erred by instructing the jury that the promise of good faith and fair dealing implied in every contract was a factor to consider in determining whether Farmers needed good cause to terminate Marcia's agency agreement. The actual instruction given read: "And in every contract there is an implied promise of good faith and fair dealing. This means that each party impliedly agrees not to do anything to destroy or injure the right of the other party to receive the benefits of the contract. Thus, each party has the duty not to prevent or hinder performance by the other party." As Farmers concedes, "the language correctly stated the implied-in-law covenant of good faith and fair dealing, and such instruction was certainly pertinent (at the time of trial) to Marcia's claim of tortious breach of contract. (But see *Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d 654.)" The problem with the instruction, Farmers argues, is that it misled the jury: "Obviously, Farmers could do nothing more likely to 'destroy or injure the right of [Marcia] to receive the benefits of [her] contract' or to 'prevent . . . [her] performance' than to terminate her agency! That said, there was little more for the jury to consider: termination was

a breach of the implied covenant and, by implication, also a breach of contract." (Italics deleted.)

Again, we disagree. We note that the Supreme Court in *Foley* laid to rest the notion that the implied covenant of good faith and fair dealing somehow created an independent source of job security rights. "After all, when an employment relationship is—as a matter of agreement—terminable at will, terminating an employee without good cause does not deprive the employee of the benefits of the agreement." (Kuenzel, Employment "At Will," Employers at Risk: Managing the Challenges of Firing Decisions In the Post-*Foley* Era (Prentice Hall 1989) p. 23.) Thus, the instruction did not, as Farmers claims, virtually guarantee a finding that Farmers breached its contract with Marcia.

Farmers' third claimed error relates to Marcia's tortious breach of the covenant of good faith and fair dealing cause of action. In view of our holding in section B, *ante,* this issue is moot.

Finally, Farmers contends that the court gave an erroneous instruction on the limit of damages recoverable for breach of contract. We agree that the instruction was incorrect but conclude that the error was not prejudicial.

As Farmers correctly observes, under California law a plaintiff in a breach of contract action is entitled to damages "which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300.) The detriment that is "likely to result therefrom" is that which is foreseeable to the breaching party at the time the contract is entered into. (*Coughlin* v. *Blair* (1953) 41 Cal.2d 587, 603 [262 P.2d 305].)

Rather than limiting the damages recoverable to that which was foreseeable, the court instructed the jury that Marcia was entitled to compensation for "all loss and harm that the particular breach caused . . . with respect to . . . her Farmers agency insurance book of business, both to date and in the future."

The trial court admitted that the instruction was erroneous on its ruling on Farmers' motion for a new trial. (The court stated: "Under these instructions, the jury was not required to consider foreseeability as a legal limitation on the amount of contract damages. . . . Although [Farmers] did not object to this given instruction, and did not request such an additional instruction . . . , the court concludes that such a limitation was required sua sponte." The trial court then determined that its erroneous instruction

was prejudicial with respect to Dan's contract claim but not with respect to Marcia's. We agree.

By limiting the damages caused by the breach to Marcia's "Farmers agency insurance book of business," her award was limited to the loss of the value of her agency. There is simply no evidence to support Farmers' contention that the award may have included damages "for the overall drop in [Marcia's] standard of living about which she complained at trial."

## DANIEL'S CROSS-APPEAL

### A. *Reduction of Jury's Damages Award*

Daniel and Marcia executed two written contracts transferring Daniel's agency to Marcia. The first one was dated June 11, 1984, and specified a sales price of $200. The second was dated June 25, 1984, and specified a sales price of $24,000.

Before trial, the trial court granted Daniel's motion to amend his cause of action to allege general contract damages in the amount of $23,700 plus interest from June 25, 1984. Daniel's counsel stated that the amount represented "[l]ost benefits of a contract." He further stated, "It's 23, 7 is all there is."

During trial, Daniel introduced expert testimony on the subject of the market value of his business. The expert rendered an opinion on this subject based upon Daniel's past production, data regarding renewal commissions, estimates of Daniel's "working life," and the like. Daniel's counsel argued to the jury that this evidence justified a verdict for Daniel in a range from $301,000 to $879,000.

The trial court's order granting a conditional new trial was granted on one ground, excessive damages. The trial court's order explained that Daniel's cause of action was submitted to the jury on the theory of breach of the provision in the agency appointment agreement between Daniel and Farmers regarding a conditional sale of the agency to a family member. The order noted that the jury was instructed that a commercially reasonable justification was required of Farmers for Farmers to refuse to approve Daniel's sale to Marcia. The order observed that the agreement limited any sales price of Daniel's agency to the contractually defined contract value. It also observed that Daniel offered no evidence which indicated that the parties intended the compensation upon termination to be any amount other than contract value.

In essence, the trial court believed it admitted irrelevant evidence on the issue of Daniel's contract damages.

The trial court's order also opined that certain jury instructions in conjunction with the irrelevant evidence lead the jury to award excessive damages. It noted that the undisputed evidence at trial demonstrated the contract value of Daniel's agency on the date he terminated his agreement was $30,316. The trial court rendered its order accordingly.

 Daniel contends that the trial court erred because "There is no question but that Dan's agency had a market value in excess of 'contract value,'" "Farmers' argument that Dan's damages for its breach of the family sale provision must be limited to 'contract value' is fundamentally unfair," and "Denial of a right on Dan's part to recover such damages also would result in Farmer's [*sic*] unjust enrichment."

The principles applicable to a motion for a new trial on the ground of excessive damages are well settled. The trial court may, in its discretion, order a new trial limited to the issue of damages and may condition its order so that the motion is denied if the party in whose favor the verdict has been rendered consents to a reduction of so much thereof as the court in its independent judgment determines from the evidence to be fair and reasonable. (Code Civ. Proc., § 662.5.) In ruling on a motion for a new trial for excessive damages, the trial court does not sit in an appellate capacity but as an independent trier of fact. (*West* v. *Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831, 876 [220 Cal.Rptr. 437, 59 A.L.R.4th 1].) "A new trial shall not be granted upon the ground of . . . excessive . . . damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (Code Civ. Proc., § 657, subd. 7.) An order granting a new trial on the ground of excessive damages shall be reversed only if there is no substantial basis in the record for the reasons given for the order. (*Ibid.*) Stated another way, an appellate court may reverse an order granting a new trial for excessive damages only when the reasons given by the trial court reflect a manifest and unmistakable abuse of discretion. (*West* v. *Johnson & Johnson Products, Inc., supra*, 174 Cal.App.3d at p. 876.)

"While the concept 'abuse of discretion' is not easily susceptible to precise definition, the appropriate test has been enunciated in terms of whether or not the trial court exceeded ' "the bounds of reason, all of the circumstances before it being considered. . . ." ' [Citations.]" (*Troxell* v. *Troxell* (1965) 237 Cal.App.2d 147, 152 [46 Cal.Rptr. 723].)

 It is apparent from the order that the trial court listed the factors it considered, weighed those factors, and exercised its independent judgment in deciding what was fair and reasonable in terms of compensatory damages. It considered the agency appointment agreement which entitled Daniel to compensation upon termination of his agency in an amount calculated as the contract value of the agency. Then it considered the evidence introduced at trial which indicated that the agency had a market value in excess of contract value. The evidence of market value has significance only if the contractual limitation on the amount of compensation upon termination is ignored. However, the trial court observed that no evidence was introduced at trial to challenge the contractual limitation. The trial court thus discounted the evidence of market value and decided that contract value was fair and reasonable in terms of compensatory damages.

Daniel's arguments amount to no more than the trial court should have, without reason, ignored the contractual limitation. The arguments manifestly fall short of demonstrating that the trial court's decision exceeded the bounds of reason. Daniel has simply failed to carry his burden on appeal.

"[W]e must be constantly aware of the different functions performed by the superior court and ourselves. Unless, ultimately, each case of this nature is to be decided by the Court of Appeal as if no trial court had ever acted . . . , we must be careful to preserve the area of the superior court's discretion and we must do this in fact, as well as in words." (*Bennett* v. *City of Los Angeles* (1970) 12 Cal.App.3d 116, 120 [90 Cal.Rptr. 479].)

B. *Attorney's Fees*

 Daniel and Marcia contend they were entitled to attorney's fees under *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796] and under Code of Civil Procedure section 1021.5. We conclude, as did the trial court, that their reliance on these rules is misplaced.

It is well settled in California that attorney's fees are not recoverable in the absence of a statutory or contractual provision for the recovery of same. (Code Civ. Proc., § 1021.) In *Brandt, supra,* 37 Cal.3d 813, the Supreme Court recognized a narrow exception to this rule regarding legal fees incurred by a client *in a tort action.* The court held that where an insurer tortiously (i.e., in "bad faith") withholds policy benefits due its insured, forcing the insured to incur attorney's fees to recover such benefits, then the legal fees incurred are an additional item of damages recoverable against the insurer much like medical fees are damages in a personal injury action. (37 Cal.3d at p. 817.) In the instant case, however, the fees were incurred in a contract, not a tort action. As noted earlier, the Supreme Court in *Foley* v.

*Interactive Data Corp., supra*, 47 Cal.3d 654, 700, held that a breach of the implied covenant of good faith and fair dealing implied in an employment agreement gives rise only to contract damages. Thus, *Brandt* is inapplicable to this action.

■ Alternatively, Daniel and Marcia claim they are entitled to an award of attorney's fees pursuant to Code of Civil Procedure section 1021.5, the "private attorney general" doctrine. ■ In order to invoke this doctrine, the litigation must have resulted in the "enforcement of an important right affecting the public interest," "a significant benefit" must have been conferred on the general public or a large class of persons, the financial burden of private enforcement must make an award of fees appropriate, and justice must require that the attorney's fees be paid by the opposing party rather than out of the litigation proceeds. (*Serrano* v. *Priest* (1977) 20 Cal.3d 25, 35 [141 Cal.Rptr. 315, 569 P.2d 1303].)

■ This statute is inapplicable on its face. "Section 1021.5 was not designed as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest." (*Beach Colony II* v. *California Coastal Com.* (1985) 166 Cal.App.3d 106, 114 [212 Cal.Rptr. 485].) We find no abuse of discretion in the trial court's order denying attorney's fees.

### DISPOSITION

The judgment in favor of Marcia, to the extent it is based on the tort causes of action, is reversed. The judgment in favor of Marcia, in the amount of her contract claim, $240,000, is affirmed. The trial court is directed to enter a new judgment accordingly. Farmers' appeal from the judgment in favor of Daniel is dismissed. The orders granting Farmers a conditional new trial and striking attorney's fees are affirmed. Each side shall bear its own costs on appeal.

Agliano, P. J., and Capaccioli, J., concurred.

A petition for a rehearing was denied May 15, 1990, and the petition of defendants and appellants for review by the Supreme Court was denied August 15, 1990.