[No. B119890. Second Dist., Div. Five. Mar. 30, 1999.]

CHRISTINA BIONGHI, Plaintiff, Cross-defendant and Appellant, v. METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA et al., Defendants, Cross-complainants and Respondents.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.

**COUNSEL**

Pillsbury, Madison & Sutro, Kenneth R. Chiate, Kent B. Goss and Leanna B. Einbinder for Plaintiff, Cross-defendant and Appellant.

N. Gregory Taylor; Marcia Scully; Carlsmith Ball and Albert H. Ebright for Defendants, Cross-complainants and Respondents.

## OPINION

ARMSTRONG, J.—Christina Bionghi, doing business as Abacus Technical (Abacus), entered into an integrated contract with respondent Metropolitan Water District of Southern California (MWD). The MWD later terminated the contract. Abacus sued for breach of contract and breach of the implied covenant of good faith and fair dealing found in the contract. In additional causes of action, Abacus contended that the MWD had wrongfully interfered with its contractual relations and prospective economic advantage when it informed the Ralph M. Parsons Company that Abacus could no longer work on MWD projects. The MWD moved for summary adjudication of each cause of action.

In the published portion of this opinion, we consider whether the contract, which provides that the MWD may terminate on 30 days' notice to Abacus, is reasonably susceptible to an interpretation requiring the MWD to have good cause for termination. After a preliminary consideration of the plain language of the termination clause, we conclude that the language used by the parties is not reasonably susceptible to that interpretation. However, we recognize, as we are required to under *Pacific Gas & E. Co.* v. *G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373], that the parties may have ascribed such a meaning to the words they used. We therefore consider whether the evidence offered by Abacus establishes that the parties intended a good cause limit on the MWD's right to terminate the contract. We conclude that it does not. We also conclude that under *Masterson* v. *Sine* (1968) 68 Cal.2d 222 [65 Cal.Rptr. 545, 436 P.2d 561], extrinsic evidence was not admissible to prove the existence of a collateral agreement that good cause was required, since this was an integrated contract. We thus conclude that summary adjudication was correctly granted on the breach of contract causes of action.

In an unpublished portion of this opinion, we also find that summary adjudication was correctly granted on the remaining causes of action. We thus affirm the trial court's grant of judgment to the MWD.

### Factual and Procedural Summary

Abacus was a temporary employment agency owned by Christina Bionghi. In November of 1993, Abacus entered into a consultant contract with the MWD. Under the contract, Abacus would be paid up to $200,000 a year for providing temporary employees for the MWD's engineering division. The contract included the provision that "The Agreement may be terminated by [the MWD] hereto 30 days after notice in writing to Consultant of such

termination. [MWD's] only obligation in the event of termination shall be payment for services provided by Consultant up to and including the effective date of termination." The contract was amended effective January 1, 1995, to increase the maximum allowable annual fee to $1,250,000. The amendment did not change the termination clause in the original contract.

Both the original and amended contracts included integration clauses. In the original agreement, the clause read "It is understood that no alteration or variation of the terms of this Agreement shall be valid unless made in writing and signed by the parties hereto and that no oral understanding or agreements not incorporated herein shall be binding on any of the parties hereto." The amended agreement included a similar clause, and further provided that "Both parties have participated in the drafting of this Agreement."

On May 4, 1995, the MWD gave Abacus 30 days' notice of termination of the contract. According to the MWD, the reason for terminating the contract was the appearance of a conflict of interest. This conflict existed because Ralph M. Parsons provided management services to the MWD on the MWD's Eastside Reservoir Project, and Christina Bionghi's husband, Hossein Bionghi, a Parsons employee, was the lead cost engineer on that project. Parsons employees on the project were fully integrated with MWD personnel and acted as an extension of MWD staff. Hossein Bionghi worked at MWD headquarters as part of a management team. Further, Parsons had subcontracted with Abacus on one MWD contract relating to the project and had proposed Abacus as a subcontractor on two other MWD projects, one of which was related to the Eastside Reservoir Project. The MWD believed that the situation created the appearance of a conflict of interest, since Abacus appeared to have "an inside track" on information about the Eastside Reservoir Project, and work could be directed to Abacus by Mr. Bionghi.

Abacus contended that the MWD's real reason for terminating the contract was not the relationship between the Bionghis, which the MWD had long been aware of, but office politics, a desire to favor other consultants, and prejudice against individuals of Persian descent, such as Mr. Bionghi, which extended to their spouses.

On May 2, 1995, the MWD informed Parsons that it intended to terminate its contract with Abacus because of the appearance of a conflict of interest. In a letter and in a meeting, the MWD detailed its concerns about conflict of interest, asked Parsons to "correct the situation" as to its subcontract with Abacus on the Eastside Reservoir Project, informed Parsons that it would not authorize Abacus as a subcontractor in the proposals submitted, and gave

Parsons a copy of an August 1994 letter from the City of Los Angeles denying Abacus's application for certification as women-owned business enterprise (WBE).[1]

On May 5, 1995, Parsons terminated its subcontract with Abacus and informed Abacus that it would not be used on the two other MWD projects. Parsons's letter to Abacus stated "These actions are being taken out of a concern that Abacus participation in these projects presents the appearance of impropriety and conflict of interest because of your relationship to a Parsons employee. In addition, we are aware that Abacus Technical's standing as a qualified WBE has been challenged."

Abacus sued the MWD, bringing causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, interference with contractual relations, and interference with prospective business advantage. Other causes of action were disposed of by demurrer. The MWD moved for summary adjudication on each cause of action. The motion was granted and judgment was entered for the MWD.

## Discussion

### I. The cause of action for breach of contract

■ The contract between Abacus and the MWD provided that "The Agreement may be terminated by [the MWD] hereto 30 days after notice in writing to Consultant of such termination. [MWD's] only obligation in the event of termination shall be payment for services provided by Consultant up to and including the effective date of termination." Based on this language, the MWD alleged that it was undisputed the contract could be terminated on 30 days' notice, and that such notice was given.

Abacus did not dispute notice, but proffered extrinsic evidence which it contended established that the contract also required good cause for termination. Citing *Pacific Gas & E. Co.* v. *G.W. Thomas Drayage etc. Co., supra,* 69 Cal.2d 33 (*Pacific Gas & Electric*); *Wallis* v. *Farmers Group, Inc.* (1990) 220 Cal.App.3d 718 [269 Cal.Rptr. 299]; and *Sherman* v. *Mutual Benefit Life Ins. Co.* (9th Cir. 1980) 633 F.2d 782, Abacus argued that the termination clause was reasonably susceptible of meaning that good cause was required for termination, and thus that its proffered extrinsic evidence was admissible. In response, the MWD argued that since the contract was integrated, extrinsic evidence was not admissible to vary the terms by adding a requirement of good cause for termination.

[1] At summary judgment, Abacus presented evidence that it had been certified as a WBE by an organization which was acceptable to the MWD.

The court found that the contract was not reasonably susceptible to the meaning Abacus urged, and that parol evidence was thus not admissible, and granted summary adjudication to the MWD. We agree with the trial court. The termination clause is clear and unambiguous. With the words "The Agreement may be terminated by [the MWD] hereto 30 days after notice in writing," it provides that the only condition for termination is 30 days' notice, and allows termination with or without cause.[2]

Further, the extrinsic evidence proffered by Abacus was not admissible here. ■ "The parol evidence rule generally prohibits the introduction of any extrinsic evidence to vary or contradict the terms of an integrated written instrument. (Code Civ. Proc., § 1856.) It is based upon the premise that the written instrument is the agreement of the parties. [Citation.] Its application involves a two-part analysis: 1) was the writing intended to be an integration, i.e., a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements (*Masterson* v. *Sine* (1968) 68 Cal.2d 222 [65 Cal.Rptr. 545, 436 P.2d 561]); and 2) is the agreement susceptible of the meaning contended for by the party offering the evidence? (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)" (*Gerdlund* v. *Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 270 [235 Cal.Rptr. 279], italics omitted.)

■ Here, the agreement was integrated. Since there is no dispute about that fact, we turn to the second part of the analysis: is the agreement reasonably susceptible of the meaning contended for by the party offering the evidence? This analysis is explained in *Pacific Gas & Electric, supra,* 69 Cal.2d 33, which Abacus relies on here.

■ In that case, the Supreme Court held that "Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose. The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms. That possibility is not limited to contracts whose terms have acquired a particular meaning by trade usage, but exists whenever the parties' understanding of the words used may have differed from the judge's understanding. [¶] Accordingly, rational interpretation requires at

---

[2]Further, as to contracts such as this one, "contemplating continuing performance for an indefinite time, the general rule is that such contracts are terminable at will by either party. [Citations.]" (*Zimco Restaurants* v. *Bartenders Union* (1958) 165 Cal.App.2d 235, 240 [331 P.2d 789].)

least a preliminary consideration of all credible evidence offered to prove the intention of the parties. [Citations.] Such evidence includes testimony as to the 'circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . .' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.' [Citations.] If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, 'is fairly susceptible of either one of the two interpretations contended for . . .' [citations], extrinsic evidence relevant to prove either of such meanings is admissible." (69 Cal.2d at pp. 39-40, fns. omitted.)

The facts of *Pacific Gas & Electric* further explicate the rule. The contract before the Supreme Court included a clause in which the defendant agreed to indemnify the plaintiff for injury to property arising out of or connected with the performance of the contract. The trial court agreed with the defendant that the clause could be read to cover only injury to the property of third parties, but interpreted the clause otherwise, and refused to admit extrinsic evidence which contradicted its interpretation. The Supreme Court found error in the exclusion of evidence, holding that "Although that evidence was not necessary to show that the indemnity clause was reasonably susceptible of the meaning contended for by defendant, it was nevertheless relevant and admissible on that issue. Moreover, since that clause was reasonably susceptible of that meaning, the offered evidence was also admissible to prove that the clause had that meaning and did not cover injuries to plaintiff's property." (69 Cal.2d at pp. 40-41.)

*Pacific Gas & Electric* is thus not a cloak under which a party can smuggle extrinsic evidence to add a term to an integrated contract, in defeat of the parol evidence rule. Instead, it calls for a two-step process. First, the court must determine whether the language of the contract is reasonably susceptible to the meanings urged by the parties. In so doing, the court must give consideration to any evidence offered to show that the parties' understanding of words used differed from the common understanding. If the court determines that the contract is reasonably susceptible of the meanings urged, extrinsic evidence relevant to prove the meaning agreed to by the parties is admissible.

As *Brawthen v. H & R Block, Inc.* (1972) 28 Cal.App.3d 131 [104 Cal.Rptr. 486], explains, the rule of *Pacific Gas & Electric* "must be restricted to its stated bounds; it does no more than allow extrinsic evidence of the parties' understanding and intended meaning of the *words used in their written agreement.* While it allows parol evidence for this purpose, it is unconcerned with extrinsic collateral agreements." (*Brawthen, supra,* 28 Cal.App.3d at p. 136, italics in original.)

When we examine the case before us in light of those rules, we find that summary adjudication was properly granted. As the trial court found, the termination clause is not on its face reasonably susceptible to meaning that there can be no termination except on good cause. This is not a case where, for example, a party contended that the words "30 days" were reasonably susceptible of meaning either "30 *business* days" or "30 *calendar* days," or that, in the examples given in *Pacific Gas & Electric*, the term "United Kingdom" in a motion picture distribution contract included Ireland, or that the word "ton" in a lease meant a long ton or 2,240 pounds and not the statutory ton of 2,000 pounds. (*Pacific Gas & Electric, supra,* 69 Cal.2d at p. 39, fn. 6; *Aronowicz* v. *Nalley's, Inc.* (1972) 30 Cal.App.3d 27, 49-50 [106 Cal.Rptr. 424] [where parties contended that " '. . . we are free to terminate our agreement within 30 days,' " meant either 30 days from the agreement or 30 days after decision to terminate, evidence of what those words meant to the parties was admissible].)

Instead, Abacus offered no reason why "the Agreement may be terminated by [the MWD] . . . 30 days after notice in writing," would or could, on its face, be interpreted to mean that the MWD could terminate the contract only if it had good cause to do so.

Under *Pacific Gas & Electric*, ". . . the ambiguity may be exposed by extrinsic evidence that reveals more than one possible meaning." (*Pacific Gas & Electric, supra,* 69 Cal.2d at p. 40, fn. 8.) When Abacus's extrinsic evidence is considered as part of this preliminary step, the conclusion we draw from the face of the contract does not change. With that evidence, Abacus did not expose any ambiguity, or establish that the words of the contract were reasonably susceptible to the meaning it urged.

Abacus's evidence consisted of statements made by Ahmad Hassani, who was principal engineer of a branch of the MWD for which Abacus supplied employees, MWD manuals, and other MWD contracts. We summarize: before Bionghi signed the 1993 contract, she asked Hassani what would cause the MWD to terminate the contract. He said that no one had ever been terminated, and that as long as she did her job well there was nothing to worry about. Before Bionghi signed the 1995 contract, Hassani told her "not to worry," and that "as long as you provide your resumes, as long as your employees are happy, and as long as you don't have tax problems, I don't see any reason for us to cancel your contract."

The policy manuals set forth the procedures for termination of consultant agreements, and either provide that the termination notice must indicate the reason for termination or set forth procedures to be followed when a WBE

consultant is in noncompliance with the MWD's business outreach program policies and procedures manual.[3] The other MWD contracts cited expressly permit termination "with or without cause."

Abacus did not proffer any facts which would establish that Bionghi read or relied on the manuals or the other contracts when Abacus entered into either contract,[4] and no evidence that Hassani, who did not negotiate or sign either contract, had a position at the MWD which meant that he could express the MWD's intent, or the meaning it ascribed to words.

The evidence offered by Abacus did not concern the " 'circumstances surrounding the making of the agreement' " or allow a court to " 'place itself in the same situation in which the parties found themselves at the time of contracting.' " (*Pacific Gas & Electric, supra,* 69 Cal.2d at p. 40.) Abacus did not offer evidence concerning either the negotiations which took place before the contract was executed or the drafting process. There was thus no evidence of the positions of the parties during the negotiations, their differences and agreements, or the way in which they selected words and phrases to express the terms agreed on. There was no evidence of the parties' discussion of the meaning of the termination clause as it is found in the contract, either of the notice requirement or the provision that the MWD's only obligation in the event of termination was payment of amounts due, or evidence that the parties discussed a good cause requirement, or indeed of what the parties believed could constitute good cause for termination. There was, in sum, no evidence of the situation the parties were in at the time of contracting.

None of the evidence which was offered by Abacus indicates that the words or phrases of the termination clause are ambiguous. In fact, Abacus did not proffer this evidence for the trial court's consideration as part of *Pacific Gas & Electric*'s preliminary step, to show that "the parties' understanding of the words used . . . differed from the judge's understanding." (*Pacific Gas & Electric, supra,* 69 Cal.2d at p. 39.) Rather, the evidence was offered to establish a collateral agreement or additional contract term providing that good cause was required before the MWD could terminate the

---

[3]Abacus contends that the manual provides that a WBE consultant which is not in compliance with a contract must be given an opportunity to cure the noncompliance. In fact, the manual provides that such a consultant will be considered in material breach, but that the MWD may allow the consultant time to comply.

[4]Abacus contends that the business outreach manual, which references the termination procedures manual, was incorporated into the 1995 contract. We do not so read the contract. Instead, the only relevant incorporation is of a requirement that the consultant support MWD policy encouraging the participation of minority-and women-owned businesses.

contract. Since the contract was integrated, extrinsic evidence is not admissible for this purpose.[5] (*Masterson* v. *Sine, supra,* 68 Cal.2d 222.)

Abacus contends, however, that *Wallis* v. *Farmers Group, Inc., supra,* 220 Cal.App.3d 718 establishes that a contract termination clause which does not specify whether good cause is required is, as a matter of law, reasonably susceptible of either meaning, so that extrinsic evidence is always admissible to prove the true terms of the contract. We do not find the case persuasive, and it does not change our conclusion here.

*Wallis* considered an insurance agency contract which allowed termination on three months' notice. The plaintiff alleged in her complaint and contended on appeal that extrinsic evidence established that there was an express oral agreement and an implied-in-fact agreement, under *Pugh* v. *See's Candies, Inc.* (1988) 203 Cal.App.3d 743 [250 Cal.Rptr. 195], that she would not be fired without good cause. The Court of Appeal found that the contract was integrated on the subject of termination. Without explanation, the court then found that since the termination clause was "silent" on the subject of good cause, the agreement was reasonably susceptible of meaning that there was an express oral agreement, or an implied-in-fact agreement, that the contract could be terminated only for cause. The court determined that extrinsic evidence was admissible to determine whether such an agreement existed.[6] (*Wallis* v. *Farmers Group, supra,* 220 Cal.App.3d 718 at pp. 730-731.) By so doing, *Wallis* permitted evidence of a collateral agreement to be introduced to add a term to an integrated contract, under the guise of *Pacific Gas & Electric,* contrary to the holding of *Masterson* v. *Sine, supra,* 68 Cal.2d 222.[7]

We note, too, that to the extent that *Wallis* holds that, based solely on the words used in the contract, a termination clause which requires only notice is as a matter of law reasonably susceptible of meaning that good cause is also required, in the same way that "30 days" is reasonably susceptible of meaning either "30 business days" or "30 calendar days," *Wallis* is contrary to the holding of *Pacific Gas & Electric.* A good cause limit on the right to

---

[5]As we have noted, Abacus failed to offer evidence that at the time the contract was executed, the parties intended that good cause was required for termination.

[6]We note, too, that numerous cases have held where there is a written employment contract which provides for termination on timely notice, the *Pugh* factors have no relevance, since " ' "[t]here cannot be a valid express contract and an implied contract, each embracing the same subject, but requiring different results." [Citation.]' " (*Halvorsen* v. *Aramark Uniform Services, Inc.* (1998) 65 Cal.App.4th 1383, 1388 [77 Cal.Rptr.2d 383].)

[7]*Brawthen* v. *H & R Block Inc., supra,* 28 Cal.App.3d 131; and *Bert G. Gianelli Distributing Co.* v. *Beck & Co.* (1985) 172 Cal.App.3d 1020 [219 Cal.Rptr. 203], cited by *Wallis* (220 Cal.App.3d at p. 731, fn. 8), both concerned nonintegrated contracts. In those cases, parol evidence was properly admitted to establish a collateral agreement.

terminate is a significant contract term. In our view, a contract which provides that it may be terminated on specified notice cannot reasonably be interpreted to require good cause as well as notice for termination, unless extrinsic evidence establishes that the parties used the words in some special sense. Instead, such a contract allows termination with or without good cause.

*Sherman* v. *Mutual Benefit Life Ins. Co.* (9th Cir. 1980) 633 F.2d 782, cited by *Wallis* and by Abacus, is of no assistance to Abacus. In *Sherman*, the district court held a preliminary evidentiary hearing and determined that a contract clause which provided that the contract could be terminated "at any time by either party" meant that the contract could be terminated with or without cause, and dismissed the complaint for failure to state a cause of action. The Ninth Circuit disagreed. The court cited *Pacific Gas & Electric,* and concluded that the evidence presented at the district court hearing was sufficient to establish as a matter of law that the termination clause was reasonably susceptible to an interpretation requiring good cause. We do not reach the same conclusion about the clause before us here, since Abacus did not present evidence to establish that the clause is reasonably susceptible to such a reading.

This result is consistent with California law. "Testimony of intention which is contrary to a contract's express terms . . . does not give meaning to the contract: rather it seeks to substitute a different meaning." (*Gerdlund* v. *Electronic Dispensers International, supra,* 190 Cal.App.3d 263, 273 [contract providing that "notice of termination may be given at any time and for any reason" not reasonably susceptible of meaning that notice of termination could be given at any time for any *good* reason]; see also *Mobil Oil Corp.* v. *Handley* (1978) 76 Cal.App.3d 956, 962 [143 Cal.Rptr. 321] [where lease provided for cancellation on 90 days' notice, evidence that Mobil agents informed the franchisee that Mobil would not cancel without good cause "flatly contradicted" the unambiguous language of the lease and could not vary its terms]; *Anderson* v. *Savin Corp.* (1988) 206 Cal.App.3d 356, 364 [254 Cal.Rptr. 627] [employment agreement which provided that either party could terminate "in its discretion" was explicit; parol evidence of agreement for termination only for good cause therefore inadmissible].)

In sum, the contract here was integrated and in unambiguous terms required only notice for termination. The language of the contract is not on its face reasonably susceptible of a reading requiring good cause, and Abacus offered no extrinsic evidence under *Pacific Gas & Electric* which would indicate it was susceptible of such a meaning. Thus, as the trial court correctly found, parol evidence was not admissible to prove the terms of the contract.

## II. *The cause of action for breach of the implied covenant of good faith and fair dealing*

■ In its complaint, Abacus alleged that the MWD breached an implied covenant of good faith and fair dealing by terminating the contract without good cause and without an explanation, and by falsely assuring Abacus that the contract would not be terminated as long as Abacus did a good job. Abacus now argues that MWD breached the covenant by failing to follow its own termination procedures, as expressed in its manuals, and by inventing a pretext for terminating Abacus, in order to cover up its true motives. The MWD's motion for summary adjudication on this cause of action was made and granted on the ground that it was without merit, since the MWD had not breached the contract by terminating Abacus.

Abacus contends that the court erred in this ruling, since a cause of action for breach of the covenant of good faith and fair dealing survives in the absence of a cause of action for breach of contract. Abacus cites in support *Careau & Co.* v. *Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371 [272 Cal.Rptr. 387]. Abacus misreads *Careau.* That case held that if the plaintiff's allegations of breach of the covenant of good faith "do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." (*Id.* at p. 1395.)

Here, Abacus's claim of breach of the implied covenant relies on the same acts, and seeks the same damages, as its claim for breach of contract. Further, as *Careau* explains, tort recovery for breach of the covenant is available only in limited circumstances, generally involving a special relationship between the contracting parties, such as the relationship between an insured and its insurer. (222 Cal.App.3d at pp. 1398-1399.) Abacus has alleged no special relationship here.

Thus, the cause of action for breach of the implied covenant is duplicative of the cause of action for breach of contract, and may be disregarded. There was no error in the grant of summary adjudication on this cause of action.[8]

---

[8] In a footnote, Abacus argues that the MWD breached the implied covenant by engaging in racial bias against Bionghi, who was married to a person of Persian descent. Abacus supports this contention with deposition testimony which indicates that a MWD employee exhibited prejudice by making negative comments about Hassani, specifically, the comment that he was in the "Persian Mafia," and with the testimony of Persian MWD employees that they believed there was discrimination at the MWD. Abacus argues that the employee's bias created a chain of events which ultimately led to Abacus's termination, but provides no support for this

III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## Disposition

The judgment is affirmed.

Turner, P. J., and Godoy Perez, J., concurred.

A petition for a rehearing was denied April 19, 1999, and appellant's petition for review by the Supreme Court was denied June 30, 1999.

---

proposition. In contrast, the MWD's proffered facts about the decision to terminate Abacus indicate that the decision did not involve the allegedly biased employee. Abacus's allegations do not create a triable issue of fact on the breach of the covenant of good faith.
   *See footnote, *ante*, page 1358.