Karon L. **COMEAUX**; Sherrika Marzette Comeaux, Plaintiffs–Appellants,

v.

**BROWN & WILLIAMSON TOBACCO COMPANY, Defendant–Appellee.**

No. 89–15584.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 1990.

Decided Sept. 26, 1990.

William F. Murphy, Dillingham & Murphy, San Francisco, Cal., for plaintiffs-appellants.

Robert J. Stumpf, Bronson, Bronson & McKinnon, San Francisco, Cal., for defendant-appellee.

Before SNEED, FARRIS and FERNANDEZ, Circuit Judges.

SNEED, Circuit Judge:

Karon Comeaux (Comeaux) filed suit against Brown & Williamson Tobacco Corporation (B & W), alleging that B & W had reneged upon its promise of employment to Comeaux. He asserted six causes of action arising out of B & W's failure to employ him and three causes of action arising out of a credit check B & W performed during the course of the litigation. He appeals the district court's grant of summary judgment in favor of B & W. We affirm in part and reverse and remand in part.

## I. FACTS AND PROCEEDINGS BELOW

In July 1987, plaintiff-appellant Comeaux applied for a position as a sales representative with defendant-appellee B & W. He alleges that after several interviews with B & W, the company's hiring manager told him orally that he was hired: "We are making you an offer.... Mr. Watratz ... gave me the okay to go ahead and hire you, but you have to take a physical and we have to wait on the rest of the paperwork to come down." Comeaux asserts that the hiring manager stated that the offer of employment was contingent upon his moving "within five minutes of his first sales stop in Fremont 'as soon as possible.' " In addition, his start date was to be around August 18 and he was to give his then-current employer one week's notice.

Comeaux passed the physical examination, gave notice to his then-current employer, moved with his new wife from San Jose to Fremont, and stood ready to report for work on August 18. On August 18, a B & W manager named Littleton called Comeaux. Littleton said that Comeaux's start date would be delayed, but that there were no problems with Comeaux's employment status.

B & W ran a credit check on Comeaux on August 19, 1987. It does not dispute that it never informed Comeaux that a credit check would be performed and that the findings of the report could affect Comeaux's employment with the company. Furthermore, B & W does not dispute that it violated its own internal policy by failing to inform Comeaux about the credit check and its role in B & W's employment decisions.

The credit report revealed that Comeaux had a poor credit history, but it did not

indicate that he had filed for protection under Chapter 13 of the Bankruptcy Code. Comeaux states that on August 21, Littleton called him and said: " 'They are rejecting your employment. They are not going to be able to go through with everything because of a past credit history, your past credit history.' " Apparently Comeaux asked Littleton whether Comeaux's Chapter 13 bankruptcy was at issue. Allegedly, Littleton then indicated he did not know, since he was not privy to the report, but then stated: " 'Bankruptcy or not, it probably wouldn't even matter.' "

On August 25, Comeaux spoke with Paul Watratz, the individual he perceived as having the authority to hire and fire in this case. In the conversation, Watratz confirmed B & W's position regarding Comeaux's employment status. Watratz told Comeaux that B & W had previously found that some sales representatives had mishandled their contingency funds. Reportedly, he said to Comeaux: "[I]f that happened here you could not seek protection under Chapter 13."

Comeaux filed suit against B & W in the California Superior Court in Alameda County on December 15, 1987. B & W had the case removed to federal district court in the Northern District of California. During discovery, Comeaux learned that B & W had checked his credit again in the midst of the litigation.

It is undisputed that B & W requested that Trans Union Credit Information Company (Trans Union), a credit bureau with whom it had an ongoing relationship, check Comeaux's credit again in February 1988. It is also now undisputed that the purpose for which B & W intended to use and did use the credit report was to assist it in preparing its defense of this action. The contract between B & W and Trans Union, signed in November 1986, indicates that the parties are governed by the Federal Credit Reporting Act, 15 U.S.C. § 1681 et seq. (1988) (FCRA);[1] the contract also sets out the exclusive circumstances under which credit reports may be obtained.[2] Deposition testimony of Donna B. Higdon, a B & W employee, revealed that B & W stated in its request to Trans Union for the February 1988 credit report that it sought the report for employment purposes. In her deposition, Darlene Edlin, the employee of B & W who signed the original contract with Trans Union, and who instructed Donna Higdon to order the February 1988 credit report, stated that B & W was not considering Comeaux for employment at the time it ordered that report from Trans Union.

Therefore, in May 1988, Comeaux amended his complaint, ultimately alleging the following nine causes of action: (1) breach of covenant of good faith and fair dealing; (2) termination in violation of the nondiscrimination provision of the Bankruptcy Code; (3) breach of contract; (4) promissory estoppel; (5) wrongful termination in violation of public policy, arising out of the alleged violation of the bankruptcy laws; (6) loss of consortium;[3] (7) invasion of pri-

[1.] The first term of the contract reads as follows: "The Subscriber Agrees: 1. To comply with all provisions of the Fair Credit Reporting Act" (citation omitted).

[2.] The contract reads, in pertinent part:
THE SUBSCRIBER AGREES:
....
5. To request information only for the Subscriber's exclusive use, and the Subscriber certifies that inquiries will be made only for the following purposes ..., and no other purpose:
a. In connection with a credit transaction involving the consumer on whom the information is to be furnished....
b. For employment purposes....
....
d. In connection with a business transaction involving the consumer; and the Subscriber agrees to identify ... each request for this purpose at the time such report is ordered, and to specify the business purpose for such report....

....
(THE FAIR CREDIT REPORTING ACT PROVIDES THAT ANY PERSON WHO KNOWINGLY AND WILLFULLY OBTAINS INFORMATION ON A CONSUMER FROM A CONSUMER REPORTING AGENCY UNDER FALSE PRETENSES SHALL BE FINED NOT MORE THAN $5,000, OR IMPRISONED NOT MORE THAN ONE YEAR, OR BOTH.)

[3.] Comeaux's wife, Sherrika Comeaux, a co-plaintiff, alleged that B & W's wrongful termination of her husband caused her and would continue to cause her to suffer the loss of her husband's "love, companionship, comfort, affection, society, solace or moral support."

vacy by the February 1988 credit check; (8) willful violation of the FCRA through the February 1988 credit check; and (9) negligent violation of the FCRA through the February 1988 credit check.

In November 1988, B & W moved for summary judgment, asserting that: (1) Comeaux's employment contract with B & W was terminable at will; therefore, there was no breach of the covenant of good faith and fair dealing or of contract as a matter of law; (2) Comeaux's performance was bargained for and that there could thus be no promissory estoppel; (3) B & W had no knowledge of Comeaux's bankruptcy before rendering its employment decision, so it therefore could not have violated 11 U.S.C. § 525(b); (4) B & W violated no public policy as a matter of law, and therefore did not wrongfully terminate Comeaux in violation of public policy; (5) Comeaux did not allege any injury as a consequence of B & W's conduct sufficient to disturb the marital relationship and thus did not cause Mrs. Comeaux's asserted loss of consortium; (6) B & W did not invade Comeaux's privacy because it did not publish the information concerning him; and (7) B & W did not obtain a "consumer report" as defined by the FCRA, which means that it did not violate that Act willfully or negligently.

At a hearing on January 12, 1989, the district court granted partial summary judgment for B. & W, issuing a written order on February 15, 1989. Specifically, the judge adopted the reasoning urged by B & W on all claims except the breach of covenant, breach of contract, and FCRA claims. It denied summary judgment as to these claims, ruling that genuine issues of fact material to the remaining claims existed and refuting B & W's claim that the February 1988 report was not a "consumer report."

On March 2, 1989, B & W filed a second motion for summary judgment. On April 3, 1989, the district court granted summary judgment for B & W on the remaining claims. Comeaux appeals the district court's judgment on all claims except the sixth cause of action: loss of consortium. Furthermore, he appeals the district court's refusal to grant him costs under Fed.R. Civ.P. 37(c). This court has appellate jurisdiction under 28 U.S.C. § 1291 (1988).

## II. STANDARDS OF REVIEW

We review grants of summary judgment de novo. *Kruso v. International Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). We must determine whether there exist any genuine issues of material fact and whether the district court applied the law correctly. *Tzung v. State Farm Fire & Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989). Denials of motions for costs under Fed.R. Civ.P. 37(c) are reviewed for abuse of discretion. *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 642, 96 S.Ct. 2778–2780, 49 L.Ed.2d 747 (1976) (per curiam).

## III. CLAIMS ARISING OUT OF B & W'S DECISION NOT TO EMPLOY COMEAUX

### A. Violation of 11 U.S.C. § 525(b)

Amendments to the Bankruptcy Code, effective in 1984, provide a remedy against discrimination by private employers for those seeking or receiving the protection of the Act. Specifically, the amendments bar termination of an employee *solely* because that individual: (1) has sought the protection of the Bankruptcy Code; (2) has been insolvent before seeking protection under the Act; or (3) has not paid a debt that is dischargeable under the Act. 11 U.S.C. § 525(b) (1988).[4]

---

**4.** Section 525(b) reads:

No private employer may terminate the employment of, or discriminate with respect to employment against, an individual who is or has been a debtor under this title, a debtor or bankrupt under the Bankruptcy Act, or an individual associated with such debtor or

bankrupt, solely because such debtor or bankrupt—

(1) is or has been a debtor under this title or a debtor or bankrupt under the Bankruptcy Act;

(2) has been insolvent before the commencement of a case under this title or during

■ In their appellate briefs and before the district court, the parties focused on the first of the three provisions and therefore focused on whether B & W failed to employ Comeaux solely because Comeaux had filed for bankruptcy. Comeaux failed to show that B & W knew of the bankruptcy prior to August 21, the date on which B & W informed Comeaux that it would not employ him because of his credit history. Comeaux alleges, however, that B & W did not "finalize" its decision not to hire him until several days later, at which time it clearly knew that Comeaux had filed for bankruptcy.[5] Although there may be a genuine issue as to when B & W's decision not to employ Comeaux was finalized, the resolution of that issue is not material. Comeaux has failed to show that his bankruptcy status was the *sole* reason B & W decided not to employ him.

In order to maintain a cause of action under section 525(b), a plaintiff must show that one of the reasons for discharge enumerated in section 525(b) provided the *sole* reason for termination. *See, e.g., Laracuente v. Chase Manhattan Bank*, 891 F.2d 17, 23 (1st Cir.1989); *Stockhouse v. Hines Motor Supply (Wyoming), Inc.*, 75 B.R. 83, 85, 2 Indiv.Empl.Rts.Cas. (BNA) 487, 488 (D.Wyo.1987). In the instant case, *even if* B & W had made its *final* employment decision after it learned of the bankruptcy, B & W told Comeaux *before* it knew of the Chapter 13 filing that it would not hire him because of his credit history.[6] Thus, knowledge of the bankruptcy was clearly not the sole factor influencing B &

W. Therefore, summary judgment for B & W was proper on this claim.

### B. *Wrongful Termination as Against Public Policy*

■ Comeaux alleges that his termination violated public policy because it offended the policies underlying the Bankruptcy Code. Wrongful termination as against public policy is a California tort cause of action. *See Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 665, 254 Cal. Rptr. 211, 214, 765 P.2d 373, 376 (1988); *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 178, 164 Cal.Rptr. 839, 846, 610 P.2d 1330, 1336–37 (1980). Comeaux bases this claim on the presumed violation of the Bankruptcy Code. In light of our conclusion that B & W did not violate the Bankruptcy Code and Comeaux's failure to offer any theory of wrongful termination in violation of public policy other than that grounded in section 525(b), we affirm the district court's grant of summary judgment to B & W on this claim.

### C. *Breach of Contract*

The manner in which the contractual relationship between B & W and Comeaux evolved is somewhat uncertain. Putting the best face on the facts from the standpoint of the plaintiffs, the evolution was as follows. At the time Comeaux applied for his position with B & W, he signed an employment application that included the following language:

It is agreed and understood that by assigning me work with such salary as may be incident thereto, that this applica-

---

the case but before the grant or denial of a discharge; or
 (3) has not paid a debt that is dischargeable in a case under this title or that was discharged under the Bankruptcy Act.
11 U.S.C. § 525(b) (1988).

**5.** As support for his contention, Comeaux points to an August 24, 1987 conversation between Paul Watratz, the person on whose authority Comeaux was told he originally had the job, and another B & W employee. The notes reveal that Watratz indicated in the conversation that he would still be "willing to hire" Comeaux. Comeaux interprets this conversation as indicating that B & W had not finalized its employment decision concerning him as of August 24. Ap-

parently Watratz learned of the bankruptcy prior to making *his* final decision, and implied to Comeaux on the telephone on August 25 that the knowledge of the bankruptcy filing had been a factor in his decision.

**6.** Comeaux did not allege in his complaint or appellate briefs that B & W had violated section 525(b)(3), that is, that B & W failed to hire him because he had not paid certain debts "dischargeable" under the bankruptcy statute. Absent more information, it is not possible for us to discern whether the debts listed on the credit report that led B & W to change its mind about hiring Comeaux were "dischargeable" or "discharged" under the Code.

tion shall constitute the terms of the contract of employment and that the relation between me and the Corporation shall be a hiring at will, terminable at any time by either of the parties thereto. Subsequently, he was asked to interview with B & W. Several weeks after signing the employment application, B & W offered Comeaux future employment. In the phone conversation in which the offer was tendered, B & W set forth additional terms. The company promised to assign Comeaux work and salary on or about August 18, 1987, if he met the following conditions: (1) taking a physical examination; (2) resigning his then-current job with at least one week's notice; and (3) moving his place of residence to Fremont "as soon as possible."

Even on these assumed facts, B & W contends that, on the basis of the writing referred to above, its employment relationship with Comeaux was "at will," and that it could terminate Comeaux at any time, for any reason, without liability. It asserts that its decision to "terminate" Comeaux even before he was assigned work and a salary is governed by the at-will language in the employment application. Comeaux, in response, contends that his employment relationship with B & W could be terminated for just cause only. Relying on two alternative theories, he contends that B & W personnel made verbal assurances to him at the time he signed the employment application, indicating that employment would be terminated only for violations of company policy; and that his relocation and resignation of his prior job constitute independent consideration sufficient to create a "for cause" employment relationship.

■ Under our best-case-for-Comeaux assumptions, neither analysis is material. By its own terms, the portion of the contract set forth in the writing did not begin to govern termination of the employment relationship *until* B & W assigned Comeaux work and a salary. The contract reads: "[B]y assigning me work [and] salary ... this application shall constitute the terms of the contract of employment [which] shall be a hiring at will, terminable at any time...." The writing does not deal with termination of the relationship prior to B & W's assignment of work and salary to Comeaux. Only upon such an assignment does the writing show that the contract was supported by independent consideration.

We must look, instead, to the terms set forth in Comeaux's telephone conversation with B & W's hiring manager on the day B & W offered Comeaux employment in order to determine the terms of the relationship prior to when the "at will" provision was to take effect. The express terms of the offer were that if Comeaux passed a physical examination, resigned his then-current job, and moved to Fremont within the time frame specified, B & W would assign him work and salary on or about August 18. These express terms, together with the terms of the writing, constituted his employment contract.

■ Comeaux satisfied all of the conditions set forth by B & W. He shifted his position to his detriment in reliance on B & W's promise to assign him work and a salary on or about August 18. But B & W breached its agreement with Comeaux because it never assigned Comeaux work and salary. B & W cannot argue that it had no obligation to assign Comeaux work and a salary on the basis that Comeaux's ultimate employment would be governed by an at-will term in the contract. *See Filcek v. Norris Schmid, Inc.,* 401 N.W.2d 318, 319, 156 Mich.App. 80, 84 (Ct.App.1986) (existence of at-will employment contract does not bar breach of contract action where prospective employer repudiates agreement before employee started employment and after she resigned prior job). We find that, because B & W never assigned Comeaux work and a salary, the parties *never reached* the point in time when the writing would begin to govern termination of the relationship. Therefore, whether or not Comeaux's ultimate employment would have been at will is immaterial to our analysis of whether the contract was breached before Comeaux's employment began.

■ On the facts we have assumed, B & W violated its own internal policy by failing

to inform Comeaux that his future employment was contingent upon the results of a credit check. If B & W had been forthright with Comeaux, Comeaux could have decided whether to accept B & W's offer on the terms B & W set forth or to attempt to negotiate more favorable terms. Yet B & W deprived Comeaux of the opportunity to make an informed decision prior to accepting the offer and shifting his position to his detriment. All along, unbeknownst to Comeaux, there existed a "hidden" contractual term that had not been disclosed, bargained-for, or agreed-upon. A party may not protect itself from liability under a contract by asserting that a heretofore hidden term is somehow part of the agreement. Comeaux reasonably thought he had bargained for and obtained an opportunity to begin work if he met the explicit conditions set forth by B & W. We would, under these assumptions, hold that B & W is liable to Comeaux for those damages Comeaux incurred in reliance on B & W's promise of employment.

Comeaux argues, however, that he is due expectancy damages because B & W could terminate his eventual employment for cause only. We do not agree. We hold that the contract of employment that would have governed the parties' relationship once Comeaux was assigned work and a salary was terminable at will.

■ In California, employment is presumed to be "at will," and an employee can be fired without good cause, unless there exists an express or implied contract that restricts the employer's right to terminate the employee. *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 665, 254 Cal.Rptr. 211, 214, 765 P.2d 373, 376 (1988). Specifically, in California, a for-cause contract exists where: (1) "the parties agreed, expressly or impliedly, that the employee could be terminated only for good cause," *or* (2) "the contract was supported by consideration independent of the services to be performed by the employee for his prospective employer." *Rabago–Alvarez v. Dart Indus., Inc.*, 55 Cal.App.3d 91, 96, 127 Cal. Rptr. 222, 225 (Ct.App.1976). *See Pugh v. See's Candies, Inc.*, 116 Cal.App.3d 311, 326, 171 Cal.Rptr. 917, 925 (Ct.App.1981).

■ Neither condition was met here. First, Comeaux failed to show that the writing, which explicitly states that the employment relationship is terminable at will, was superseded by an implied termination-only-for-cause agreement.[7] Second, Co-

---

7. Comeaux alleges that, at the time he signed the writing, B & W personnel made verbal assurances to him that he could be fired only for violations of company policy. Such parol evidence is inadmissible to show the nature of an agreement unless the writing is not fully integrated *or* is susceptible to the meaning urged by the party offering the evidence. *McLain v. Great Am. Ins. Cos.*, 208 Cal.App.3d 1476, 1483, 256 Cal.Rptr. 863, 867 (Ct.App.1989) (citations omitted).

We conclude that the writing was an integration with respect to the particular subject matter explicitly covered by the contract. The writing contained an integration clause, *see id.* at 1484, 256 Cal.Rptr. at 867; *Gerdlund v. Electronic Dispensers Int'l*, 190 Cal.App.3d 263, 268, 235 Cal.Rptr. 279, 280 (Ct.App.1987), and it made no provision for its modification by subsequent written or oral agreements, *cf. Wallis v. Farmers Group, Inc.*, 220 Cal.App.3d 718, 730, 269 Cal.Rptr. 299, 305 (Ct.App.1990) (contract that refers explicitly to the continuing validity of "supplementary written agreements" is not intended to be a complete and final embodiment of the terms of the parties' relationship); *McLain*, 208 Cal.App.3d at 1485, 256 Cal.Rptr. at 868 (contract that notes that the terms and con-

ditions of employment "may be changed" at any time by employer is not integrated agreement).

It is true that the document does not set forth all of the terms that would ultimately govern the parties' relationship. But "[w]here, as here, a writing is intended by the parties as a final expression of their agreement *with respect to a particular subject matter* or term, the writing is integrated as to those terms...." *Wallis*, 220 Cal.App.3d at 730, 269 Cal.Rptr. at 305. *See also Slivinsky v. Watkins–Johnson, Co.*, 221 Cal. App.3d 799, 805, 270 Cal.Rptr. 585, 588 (Ct.App. 1990). Therefore, we conclude that the writing is a complete integration as to the at-will nature of termination once Comeaux commenced employment. However, supplementary terms not addressed by the writing but supplied by oral conversations (such as that which set forth the conditions of Comeaux's employment) are a part of the agreement, even though they were not a part of the writing.

Where the contract is an integrated agreement, parol evidence still might be admissible if the evidence is " 'relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' " *McLain*, 208 Cal.App.3d at 1486, 256 Cal.Rptr. at 869 (quoting *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage Co.*, 69 Cal.2d

meaux failed to show that the contract was supported by independent consideration.[8] Therefore Comeaux, under the facts we have assumed, is due only reliance damages.

We reverse the district court's grant of summary judgment as to the breach of contract claim because under not unreasonable assumptions with regard to the facts Comeaux would be entitled to recover reliance damages. On remand, the court should assess such damages provided Comeaux establishes the facts we have assumed by a preponderance of the evidence.

D. *Breach of Implied Covenant of Good Faith and Fair Dealing and Promissory Estoppel*

 Comeaux cannot use the covenant of good faith and fair dealing to *transform* a terminable-at-will employment contract into a terminable-only-for-cause employment contract by construing a discharge without cause as a breach of the covenant. *See Mundy v. Household Finance Corp.,* 885 F.2d 542, 544 (9th Cir.1989); *Foley,* 47 Cal.3d at 698 n. 39, 254 Cal.Rptr. at 238 n.

39, 765 P.2d at 400, n. 39. Therefore, the implied covenant provides no basis for Comeaux to obtain expectancy damages.

 The implied covenant, however, remains available as a cause of action, even in the face of an at-will employment contract, where a plaintiff alleges that conduct *other than* his discharge violated the covenant.[9] Here, Comeaux complains that B & W misrepresented to him the conditions precedent to employment while inducing him to shift his position to his detriment in reliance on the offer. We need not decide this issue, however. Nor do we need to address the promissory estoppel issue. Neither theory can provide a remedy other than reliance damages. The district court on remand may consider whether the facts entitle Comeaux to such damages under either theory bearing in mind that whatever the theory reliance damages may be recovered only once. If we decided this claim in favor of Comeaux, the remedy would be reliance damages. Yet, Comeaux can be awarded reliance damages only once, and we have already determined that he possibly may be entitled to reliance dam-

33, 37, 69 Cal.Rptr. 561, 564, 442 P.2d 641, 644 (1968)). *See also Slivinsky,* 221 Cal.App.3d at 805, 270 Cal.Rptr. at 588; *Wallis,* 220 Cal.App.3d at 730, 269 Cal.Rptr. at 306. Here, the contract was clearly unambiguous as it concerned termination once employment began. It stated in no uncertain terms that employment is at will. We have held that California law bars the consideration of implied contractual terms that are inconsistent with express contractual terms where the express terms were laid out in an employment application. *Gianaculas v. Trans World Airlines, Inc.,* 761 F.2d 1391, 1394 (9th Cir.1985). "'There cannot be a valid express contract and an implied contract each embracing the same subject, but requiring different results.'" *Id.* (citation omitted). *See also Slivinsky,* 221 Cal. App.3d at 806, 270 Cal.Rptr. at 588; *Tollefson v. Roman Catholic Bishop of San Diego,* 219 Cal. App.3d 843, 855, 268 Cal.Rptr. 550, 557 (Ct.App. 1990). Therefore, the oral statements cannot be admitted to create an implied termination-only-for-cause contractual agreement.

8. Comeaux contends that his resignation from his prior job and his relocation to Fremont constitute such independent consideration. Yet, in California, "an employee does not convert an at-will employment agreement into an agreement providing for termination-only-for-cause

simply by showing that the employee left attractive prior employment in order to take a new job." *Hillsman v. Sutter Community Hosps.,* 153 Cal.App.3d 743, 753, 200 Cal.Rptr. 605, 611 (Ct. App.1984). The employee must show that he gave up prior employment only after *explicitly* bargaining with the employer to do so in exchange for the promise of a termination-only-for-cause contract. *See Rabago–Alvarez v. Dart Indus., Inc.,* 55 Cal.App.3d 91, 96–97, 127 Cal. Rptr. 222, 225 (Ct.App.1976). Furthermore, relocation, in and of itself, does not constitute independent consideration, absent such evidence of explicit bargaining. *See Ferreyra v. E. & J. Gallo Winery,* 231 Cal.App.2d 426, 432–33, 41 Cal.Rptr. 819, 822 (1964).

9. *See Sheppard v. Morgan Keegan & Co.,* 218 Cal.App.3d 61, 67, 266 Cal.Rptr. 784, 787 (Ct. App.1990) (breach of covenant may be found despite at-will employment contract); *Hejmadi v. AMFAC, Inc.,* 202 Cal.App.3d 525, 549, 249 Cal.Rptr. 5, 19 (Ct.App.1988) (even where employment is strictly at will, there may exist legitimate expectations of contractual benefits other than continuing employment). B & W's alleged misrepresentation in its negotiations with Comeaux in violation of its own internal policies could, arguably, constitute a cause of action under the implied covenant.

ages under the contract theory.[10] Based on the same reasoning, we decline to address Comeaux's promissory estoppel claim.

## IV. CLAIMS ARISING OUT OF THE FEBRUARY 1988 CREDIT CHECK

### A. Willful and Negligent Violation of 15 U.S.C. § 1681

In its February 15, 1989 order, the district court held that "the February [credit] Report is a 'consumer report' as defined by the FCRA" and it denied B & W's summary judgment motion as to the claims of willful and negligent violation of the FCRA. Then on April 3, 1989, it granted summary judgment to B & W on these claims, holding that, although the February 1988 credit report was a "consumer report," the report's use was not within the reach of the FCRA because the report had been used for a "business purpose," not a "consumer purpose."

The district court correctly found that the February 1988 report is a "consumer report" under the FCRA. However, the court erred in concluding that using the report for a "business purpose," removes it from the reach of the FCRA.

 The FCRA, 15 U.S.C. § 1681 (1988), provides for civil liability and criminal penalties for those who do not comply with the Act. Sections 1681n and 1681o, respectively, make consumer reporting agencies and users liable for willful or negligent noncompliance with "any requirement imposed" under the Act.[11] Section 1681q provides a criminal penalty for

"knowingly and willfully obtain[ing] information on a consumer from a consumer reporting agency under false pretenses." 15 U.S.C. § 1681q. We held in Hansen v. Morgan, 582 F.2d 1214, 1221 (9th Cir.1978), that "§ 1681q states an explicit 'requirement imposed under this subchapter [the FCRA]'. Noncompliance with § 1681q thereby forms a basis of civil liability under § 1681n." Hansen's construction has been adopted by the other circuits addressing this question. See Yohay v. City of Alexandria Employees Credit Union, Inc., 827 F.2d 967, 972 (4th Cir.1987); Zamora v. Valley Fed. Sav. & Loan Ass'n, 811 F.2d 1368, 1370 (10th Cir.1987) (per curiam); Kennedy v. Border City Sav. & Loan Ass'n, 747 F.2d 367, 369 (6th Cir.1984).

B & W told Trans Union that it wanted the February 1988 credit report on Comeaux "for employment purposes." The record before us establishes that this statement was false, even though B & W claimed at one stage in the litigation that it was true. Thus, B & W requested the report under false pretenses, thereby violating section 1681q and providing Comeaux with a cause of action under section 1681n or section 1681o.

 B & W argues, however, that its receipt and use of the February 1988 credit report is not governed by the FCRA, which only regulates "consumer reports." It claims that the report was not a consumer report because it sought the report for a non-consumer purpose. The term "consumer report" is defined in section 1681a(d).[12] The plain language of section

---

**10.** At one time in California, a plaintiff could obtain tort damages for a successful action claiming breach of the implied covenant of good faith and fair dealing. However, the California Supreme Court has held that, in the employment context, only contract and not tort remedies are available under the covenant. *Foley*, 47 Cal.3d at 696, 254 Cal.Rptr. at 236–37, 765 P.2d at 398. If B & W violated the covenant of good faith and fair dealing by failing to inform Comeaux of a material precondition to its employment of him while inducing him to shift his position in reliance on the promise of employment, the only remedy available to him would be reliance damages.

**11.** Those who willfully or negligently violate the requirements of the FCRA are liable for actual damages, costs, and attorneys' fees. 15 U.S.C. §§ 1681n, 1681o (1988). Those who willfully violate the requirements of the FCRA also may be liable for punitive damages at the court's discretion. 15 U.S.C. § 1681n.

**12.** The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness ... which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be

1681a(d) reveals that a credit report will be construed as a "consumer report" under the FCRA if the credit bureau providing the information *expects* the user to use the report for a purpose permissible under the FCRA, without regard to the ultimate purpose to which the report is *actually* put. *See Hansen,* 582 F.2d at 1218; *Ippolito v. WNS, Inc.,* 864 F.2d 440, 449–50 (7th Cir. 1988), *cert. dismissed,* —— U.S. ——, 109 S.Ct. 1975, 104 L.Ed.2d 623 (1989); *Heath v. Credit Bureau of Sheridan, Inc.,* 618 F.2d 693, 696 (10th Cir.1980). Thus, if the user of the report led the agency preparing the credit report to believe, either through commission or omission, that the report was to be used for a consumer purpose such as for an employment purpose, the report *is* a consumer report within the meaning of the FCRA.

B & W's construction of the statute would render meaningless the FCRA's goal of allowing the release of credit reports for certain purposes only. *See, e.g., St. Paul Guardian Ins.,* 884 F.2d at 884–85 (holding that such an interpretation of the FCRA is "illogical," "untenable," "contrary to congressional intent," and "creates irreconcilable conflicts between [FCRA's] statutory provisions"). B & W's construction also would render section 1681q meaningless by allowing those who request reports under

false pretenses, *stating* a permissible purpose, to be exempt from section 1681q by *using* reports for a non-permissible purpose. *Id.* at 884; *Kennedy,* 747 F.2d at 369. The district court's conclusion that a report can be a "consumer report" under the FCRA, but not governed by the FCRA because it is for some non-consumer purpose, has no basis in the law of this or any other circuit.[13] The law of this circuit, as well as that of almost all other circuits that have addressed the question, supports the following proposition: *If a consumer reporting agency provides a report based on a reasonable expectation that the report will be put to a use permissible under the FCRA, then that report is a "consumer report" under the FCRA and the ultimate use to which the report is actually put is irrelevant to the question of whether the FCRA governs the report's use and the user's conduct.*

The district court, therefore, erred in granting B & W's motion for summary judgment. Furthermore, Comeaux's case for relief under section 1681 is so strong that the only genuine issue of material fact is whether B & W's noncompliance with section 1681 was willful. At the minimum, the conduct was negligent. We remand these claims to the district court for a

---

used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) other purposes authorized under section 1681b of this title....
15 U.S.C. § 1681a(d) (1988).

**13.** Furthermore, the district court misconstrued the cases that it cited in support of its conclusion. For example, in *Ippolito,* the Seventh Circuit explicitly adopted the *Hansen* standard for determining whether a report is a consumer report. 864 F.2d at 449. Using that standard, it concluded that the report at issue in *Ippolito* was not a consumer report because it was requested under an agreement with the credit reporting agency to provide non-consumer, business credit type reports. *Id.* at 450. Furthermore, nothing in the record indicated that its use of the report diverged from the use expectations of the reporting agency. *Id.* at 451. The *Ippolito* court even went so far as to say that "[f]ailing to disclose that a report is requested for a non-consumer purpose might help to establish that a report was obtained under false pretenses if a person certified that it would only

use reports for consumer purposes." *Id.* at 450. This hypothetical is precisely the case before us.

B & W relies heavily on *Mende v. Dun & Bradstreet, Inc.,* 670 F.2d 129 (9th Cir.1982) to support its position. This case interpreted the California Consumer Credit Reporting Agencies Act, not the FCRA. Even so, it supports Comeaux's position, not B & W's. Referring to similar language in the two acts, the court found dispositive that the defendant was not a consumer reporting agency. *Id.* at 133–34. The defendant agency had not prepared consumer reports since 1974 and "require[d] that its subscribers sign an agreement that they will use reports on businesses only as a basis for credit to businesses in their capacities as such." *Id.* at 132. Furthermore, in *Mende,* "there was no evidence that the reports were used for any other purpose other than their intended purpose as commercial credit reports." *Id.* at 133. Thus, in contrast to the instant case, the credit agency in *Mende* was not a consumer reporting agency. Therefore, the *Mende* court's holding that its defendant was not governed by the FCRA is inapposite.

determination of the nature of B & W's noncompliance and the fixing of damages.

## B. *Invasion of Privacy*

■ Comeaux alleges that the two credit checks performed by B & W (on August 19, 1987 and February 18, 1988) without his knowledge and consent invaded his privacy. It is undisputed that B & W used the information obtained in the first credit report to make its hiring decision concerning Comeaux and the information in the second report to assist it in this litigation. No one claims that the information was published or otherwise disseminated.

California recognizes the tort of "unreasonably intrusive" investigation as an invasion of privacy. *See Noble v. Sears, Roebuck & Co.*, 33 Cal.App.3d 654, 659–60, 109 Cal.Rptr. 269, 272 (Ct.App.1973). In *Noble*, the court found that a private investigator's deceptive entry into an accident victim's hospital room constituted an unreasonably intrusive investigation. *Id.* at 660, 109 Cal.Rptr. at 272–73. This cause of action is available to remedy the harm caused by the use of *outrageous investigative methods.*

■ In the instant case, the information that constituted the February 1988 credit report was obtained from computerized data banks and written sources. Although B & W deceived the credit union as to its purpose for requesting the report, its and the credit bureau's methods were not unreasonably intrusive, particularly when compared with those described in *Noble*. *See Kemp v. County of Orange*, 211 Cal. App.3d 1422, 1428, 260 Cal.Rptr. 131, 134 (Ct.App.1988) (holding that FCRA violation is not actionable under *Noble*). Therefore, the district court's grant of summary judgment on this claim was proper.

## V. *MOTION FOR COSTS*

■ Comeaux filed a motion under Fed. R.Civ.P. 37(c) for costs, alleging that B & W had expressly refused to admit that the February 1988 report was a consumer report under the FCRA. Thus, it sought the costs it incurred in making that proof. The district court denied the motion in its Feb-

ruary 1989 order, stating that B & W's "failure to admit that the February credit report was a 'consumer report' was based on a good faith argument."

Fed.R.Civ.P. 37(c) permits a party requesting admissions to seek costs, including reasonable attorneys' fees, incurred in proving the truth of a matter where the other party refused to admit the matter. Fed.R.Civ.P. 37(c) states that "[t]he court shall make the order unless it finds that ... (3) the party failing to admit had reasonable ground to believe that the party might prevail on the matter." We hold that the district court's conclusion that B & W's failure to admit was based on a good faith argument was not a clear abuse of discretion. Therefore, we affirm the district court's denial of costs for failure to make an admission.

## VI. *CONCLUSION*

We hereby affirm in part and reverse and remand in part the district court's grant of summary judgment to B & W. We affirm the district court's grant of summary judgment to B & W on the claims of violation of the Bankruptcy Code, wrongful termination as against public policy, and invasion of privacy. We reverse the district court's grant of summary judgment on the FCRA claims and the breach of contract claim as it relates to the contract arising from Comeaux's acceptance of B & W's telephonic offer, and remand for further proceedings consistent with this opinion. We also reverse and remand the covenant of good faith and fair dealing and promissory estoppel claims for the limited purpose set forth in the opinion. The appellee is to bear the costs of this appeal.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.