James J. MURTAGH, Jr., M.D., Plaintiff,

v.

EMORY UNIVERSITY; Manuel Martinez–Maldonado, M.D.; United States of America, as partially substituted for Manuel Martinez–Maldonado, M.D.; Juha P. Kokko, M.D., Ph.D.; Gerald W. Staton, Jr., M.D.; and Samuel M. Aguayo, M.D., Defendants.

No. CIV.A.1:99–CV–2864A–JEC.

United States District Court, N.D. Georgia, Atlanta Division.

May 31, 2001.

Edward D. Buckley, III, Greene Buckley Jones & McQueen, Patrick W. McKee, Office of Patrick W. McKee, Atlanta, GA, for James J. Murtagh, Jr., M.D., plaintiffs.

Burton Freeman Dodd, Howard B. Jackson, Fisher & Phillips, Atlanta, GA, for Emory University, defendants.

### ORDER

CARNES, District Judge.

This case is presently before the Court on plaintiff's Motion to Compel Discovery or for Sanctions [30], defendant Emory University's Motion for Summary Judgment [42], plaintiff's Motion for Enlargement of Time [43], and Consent Motion for Enlargement of Time to Respond to Defendants' Motion for Summary Judgment [46]. The Court has reviewed the record and the arguments of the parties and, for the reasons set forth below, concludes that plaintiff's Motion to Compel Discovery or for Sanctions [30] should be **DENIED**,[1] plaintiff's Motion for Enlargement of Time [43] should be **GRANTED**, the Consent Motion for Enlargement of Time to Respond to Defendants' Motion for Summary Judgment [46] should be **GRANTED**, and defendant Emory University's Motion for Summary Judgment [42] should be **GRANTED**.

### BACKGROUND

#### I. Parties' Statements of the Facts

Plaintiff is a tenured Associate Professor of Medicine at the Emory University School of Medicine. He is a member of the Division of Pulmonary Medicine, which is one of several subspecialties in the Department of Medicine. Emory University offered plaintiff a faculty position as an Assistant Professor in the School of Medicine in 1991, and plaintiff accepted the offer and joined the faculty at that time. (Emory Univ.'s Stmt. of Mat. Facts Which Are Not Genuinely Disputed [42] at ¶ 1; Dr. Murtagh's Resp. to Emory Univ.'s Stmt. of Mat. Facts and His Stmt. of Mat. Facts [48] at ¶ 1.) Dr. Juha Kokko was the Chairman of the Department of Medicine of Emory University's School of Medicine from 1986 to 1999. Dr. Kokko recruited plaintiff to come to Emory. (*Id.* at ¶ 2; *Id.* at ¶ 2.)

During the time plaintiff was being recruited by Emory, he was working at the National Institute of Health (hereinafter

---

1. Plaintiff filed an amendment [32] to his motion to compel and for sanctions in which he withdrew the motion for sanctions. This portion of the motion, therefore, is denied as moot.

"NIH"), where he was supervised by Dr. Joel Moss. (*Id.* at ¶ 15; *Id.* at ¶ 15.) Plaintiff considers Dr. Moss as a mentor. (*Id.* at ¶ 16; *Id.* at ¶ 16.) During plaintiff's recruitment to Emory, Dr. Moss told plaintiff that he should keep careful notes of his dealings with Dr. Kokko. Plaintiff stated in his deposition that he thought Dr. Moss made this recommendation, in part, because Dr. Moss felt that there had been a point in Dr. Kokko's career when he was not to be trusted. (*Id.* at ¶ 17; *Id.* at ¶ 17.) Plaintiff therefore kept a notebook of communications during his recruitment. (*Id.* at ¶ 18; *Id.* at ¶ 18.) In an entry dated May 5, 1990, plaintiff memorialized his conversation with Drs. Steve Brody, Matt and Julie Breyer, and members of the Renal Department at NIH, all of whom expressed reservations about dealing with Dr. Kokko. (*Id.* at ¶ 19; *Id.* at ¶ 19.) Dr. Maurice Berg at NIH also warned plaintiff that he should be careful when dealing with Dr. Kokko. (*Id.* at ¶ 20; *Id.* at ¶ 20.) Dr. Brody strongly expressed to plaintiff his belief that Dr. Kokko was not to be trusted. (*Id.* at ¶ 22; *Id.* at ¶ 22.) In May 1990, Drs. Manuel Martinez–Maldonado, Harry Jacobson, Drs. Matt and Julie Breyer, and "members of the Renal Department at NIH" all "expressed reservations" about Dr. Kokko. (*Id.* at ¶¶ 23–24; *Id.* at ¶¶ 23.)

Plaintiff made several trips to Emory in Atlanta in 1990 and early 1991, and he had several conversations with Dr. Kokko about a faculty position at Emory. Defendant states that Dr. Kokko thought plaintiff had great promise as a researcher, and he hoped that promise would develop over time to where plaintiff might be a candidate for a leadership position in the Department of Medicine. Plaintiff claims, however, that Dr. Kokko actually promised him that "when [he] was promoted to associate professor, if [he] earned an associate professorship under terms just like any-

one, [he] would become chief of pulmonary medicine." (*Id.* at ¶ 3; *Id.* at ¶ 3.)

As a follow-up to these visits, plaintiff wrote Dr. Kokko a letter dated February 10, 1991, in which he stated, "I am very glad that you have enough confidence in me to consider me as a candidate to head the Emory pulmonary division." (*Id.* at ¶ 13; *Id.* at ¶ 13.) Drs. Kokko and Martinez–Maldonado later sent plaintiff a letter dated March 13, 1991, offering him employment with Emory University on terms specified in the letter. (*Id.* at ¶ 4; *Id.* at ¶ 4.) The offer from Emory was an offer of employment as an Assistant Professor. The letter discussed salary, laboratory and research facilities and commitments, protected time for research, clinical obligations, teaching responsibilities, and all other important conditions of employment. It did not promise or mention the possibility of any subsequent administrative appointments, such as an appointment to the position of Chief of the Pulmonary Division. (*Id.* at ¶ 5; *Id.* at ¶ 5.)

Plaintiff responded to the letter of March 13, 1991 via a letter addressed to Dr. Kokko dated April 1, 1991. (*Id.* at ¶ 7; *Id.* at ¶ 7.) This letter contained a paragraph reading as follows:

> You have stated that when I am promoted from assistant to associate professor, you will ask me if I would like to become the permanent chief of the [pulmonary] division. The challenge of having a leadership position at Emory during the years that you and Dr. Martinez are revitalizing the research strength of the Internal Medicine department is very appealing to me. This offer is the chief reason that I have decided to accept the Emory position over other opportunities. Again, I thank you for your confidence in me.

(Def.'s Mot. for Summ. J. [42] at Ex. 2.)

Defendant claims that in the April 1 letter, plaintiff accepted Emory's offer of

employment as an Assistant Professor and merely explained his reasons for accepting the offer. Plaintiff, however, maintains that he was aware that the March 13 offer was not in accordance with his understanding of the offer and claims that because the offer letter did not refer to the leadership position, he felt that Dr. Kokko was still negotiating. He states that his April 1 letter was therefore a counteroffer. (*Id.* at ¶ 8; *Id.* at ¶ 8.) Dr. Kokko responded to plaintiff's letter by letter dated April 4, 1991. (*Id.* at ¶ 10; *Id.* at ¶ 10.) In the April 4 letter, Dr. Kokko expressed his pleasure to plaintiff of receiving plaintiff's April 1 "acceptance letter." Plaintiff agrees with the contents of Dr. Kokko's letter, but states that the April 1 letter was not an acceptance letter because it contained a counteroffer. (*Id.* at ¶ 11; *Id.* at ¶ 11.)

The parties agree that Dr. Kokko had to obtain approval from the dean of the School of Medicine before he could offer any specific terms of employment to plaintiff on behalf of Emory. (*Id.* at ¶ 25; *Id.* at ¶ 25.) Plaintiff understood that he did not have an offer of employment from Emory until her received Dr. Kokko's letter dated March 13, 1991. (*Id.* at ¶ 26; *Id.* at ¶ 26.) In addition, the parties are in agreement that appointment to the position of Division Chief is for no specific period of time. Plaintiff, however, also adds that "at the time Emory recruited him, many of the chiefs of the various divisions had been there for numerous years." (*Id.* at ¶ 27; *Id.* at ¶ 27.) Defendant states that Dr. Kokko could remove a faculty member from the position of Division Chief at will. Plaintiff agrees, but states that he is aware of no one who has been removed involuntarily once appointed to the position of Division Chief at Emory. Plaintiff states that he also disagrees with defendant's statement to the extent that it implies that he was ever an at-will employee because at all times since he joined the Emory faculty, he has had either an annual contract or tenure. (*Id.* at ¶ 28; *Id.* at ¶ 28.)

During his recruitment to Emory, plaintiff also received an offer of employment from Baylor University. (*Id.* at ¶ 29; *Id.* at ¶ 29.) Defendant claims that Baylor's offer to plaintiff was equal to Emory's in every way except for the alleged offer of the Division Chief position at Emory. Plaintiff disagrees, stating that the Baylor offer was actually better "because [he] had established collaborators, ... had spent time in Texas, and there were other things [he] liked about the Baylor opportunity as well." (*Id.* at ¶ 30; *Id.* at ¶ 30.) Defendant states that plaintiff has adduced no evidence of actual damages resulting from his failure to receive the Division Chief position. Defendant claims that during the time that Dr. Kokko was Chair of the Department of Medicine at Emory, there was no pay increase associated with appointment to the position of Division Chief. Without directly addressing the issue of whether there was a pay increase associated with a promotion to chief, plaintiff avers that the Division Chiefs made significantly more than other faculty. (*Id.* at ¶ 32; *Id.* at ¶ 32.) Plaintiff claims that he has suffered between $1,862,900 and $2,557,324 in actual damages. (*Id.* at ¶ 31; *Id.* at ¶ 31.)

## II. Procedural History

On August 31, 1999, plaintiff filed suit against Emory University, and Drs. Kokko, Martinez–Maldonado, and Stanton in DeKalb County State Court. (Compl.[1].) The case was thereafter removed to federal court. (*Id.*) Additional defendants were later added, but the claims against them have since been dismissed. On June 8, 2000, this Court entered an Order that, among other things, granted defendants' motion to dismiss in part. (Order [27].) Because plaintiff voluntarily dismissed claims against certain defendants and the

Court dismissed others, only two claims, both against defendant Emory University, now remain before the Court: (1) breach of contract and (2) promissory estoppel. Discovery was ongoing at the time the Court entered the June 8 Order and was to close on August 31, 2000. On August 31, plaintiff filed the present motion to compel [30]. In the motion, plaintiff stated that although defendant had promised several times to produce certain documents and make Dr. Kokko available for deposition, neither had occurred. By joint motion of the parties, discovery was extended until September 30, 2000. (Order [31].)

Defendant's response to the motion to compel was delayed for a short amount of time while the parties attempted to resolve their differences. (Order [36].) When defendant did respond, it argued that the remaining discovery sought by plaintiff went beyond the scope of the two remaining claims: breach of employment contract and promissory estoppel. (Emory Univ.'s Resp. to Pl.'s Mot. to Compel [38].) Defendant also notified the Court that Dr. Kokko had finally been deposed. (*Id.* at 2.) While plaintiff's motion to compel was under advisement, defendant Emory University filed a motion for summary judgment [42]. On the last day possible, plaintiff filed a request for an extension of time in which to file his own motion for summary judgment. (Mot. for Enlargement of Time [43].) In this motion, plaintiff requests that he be allowed twenty days following the production of the requested documents or twenty days from the time the Court rules on the motion to compel in order to file his own motion for summary judgment.

Plaintiff also filed a supplemental reply to Emory's response to his motion to compel [44]. In this reply, plaintiff stated that the following discovery requests were still at issue:

1.  All computer records, including e-mail, stored on hard drives of personal computers, on backup tapes, on any servers, and on any other media used by Emory University and its administrators and pertaining to the recruitment of Plaintiff, of Dr. Samuel Aguayo, and of Dr. Jesse Roman;

2.  Documents pertaining to Plaintiff's employment as described with particularity in Plaintiff's Request to Produce No. 2 including specifically:

    a.  Correspondence from Dr. Aguayo to President Chace regarding Plaintiff. Plaintiff has strong reason to believe this correspondence exists;

    b.  E-mail from Dr. Guido to Dr. Staton regarding plaintiff and the other members of the division in which he worked;

    c.  Documents including correspondence, computer records, tape recordings, notes taken by Drs. Ingram, Kokko and other members, and other records generated by, for, or in connection with, or submitted to, or reviewed by the committee chaired by Dr. Dingledine and including documents that indicate all the parties the committee interviewed or who otherwise provided input to the committee, all as more particularly described in Plaintiff's Request to Produce No. 2 and discussed in Plaintiff's Supplemental Motion and in Plaintiff's Reply to Emory University's Response in this matter. Defendant agreed with Plaintiff on September 22, 2000, to provide the documents generated in connection with the Dingledine Committee investigation, but Defendant has not produced these documents. De-

fendant further stated in its Response to this Motion that it would not provide these documents;

d. Documents, including computer records, pertaining to allegations or investigations of Plaintiff's DNR orders and other documents as more particularly described in Plaintiff's Request to Produce No. 2;

3. Documents, including computer records, requested in Plaintiff's Request No. 4 discussed in Plaintiff's Reply in this matter.

(*Id.*)

On February 13, 2001, this Court entered an Order discussing plaintiff's discovery requests. (Order [51].) In this Order, the Court noted that the information and documents requested by plaintiff did "not appear to be relevant to the narrow legal questions relevant to a determination of the issue of promissory estoppel." (*Id.* at 1.) As to the breach of contract claim, the Court recognized defendant's argument that "even if such an agreement were reached, it would be of little effect, as defendant had the ability, at any time and for any reason, to remove plaintiff from the position of Chief." (*Id.* at 2.) Third, the Court noted that there appeared to be no pay increase associated with the Chief position and, if this were the case, there would seem to be no damages related to the contract claim. (*Id.* at 3.) The Court stated:

> If plaintiff can convince the Court that he can survive defendants' motion for summary judgment on this contract claim, then perhaps more discovery is appropriate. Nevertheless, the Court would require plaintiff to set out more specifically what information he would hope to discover that is likely to lead to

the production of admissible evidence on the narrow issues now before the Court. (*Id.* at 4.) The Court gave plaintiff twenty days to respond to the Order.

On March 5, 2001, plaintiff filed his response. (Dr. Murtagh's Resp. to Feb. 13, 2001 Order Requesting Additional Information [52].) As to the promissory estoppel claim, plaintiff argues that further discovery is relevant to the issue of whether Emory should have reasonably expected plaintiff to be induced to action of forbearance. (*Id.* at 3.) Plaintiff argues that through discovery, he should be allowed to obtain information showing that Dr. Kokko intended to make the promise to plaintiff that plaintiff would be asked to be Division Chief upon his promotion to tenured professor. (*Id.* at 4.)

As to the contract claim, plaintiff contends that he needs defendant's internal correspondences and e-mail in order to show the intent of the parties. (*Id.* at 6.) Plaintiff claims that further discovery would clarify the issue of whether, as plaintiff claims, his April 1 letter was a counteroffer, which defendant accepted on April 4, or whether, as defendant maintains, the April 1 letter was simply an acceptance of defendant's original offer. (*Id.*) For example, plaintiff states that there could be an internal communication indicating that Dr. Kokko recognized plaintiff's letter as a counteroffer and intended to accept it as such. (*Id.* at 7 n. 3.)

In response to the Court's inquiry as to whether plaintiff could have been named Division Chief then removed the next day, plaintiff argues that this action (1) would constitute breach of contract because it would breach the spirit of the agreement; (2) constitutes a question of fact for the jury as to whether Emory would even be capable of doing so[2]; (3) would be com-

---

2. Plaintiff argues that a removal of plaintiff from the position of Division Chief could im-

plicate the Federal False Claims Act if Emory's actions were retaliatory. Plaintiff has

pletely out of keeping with prior practices because there has never been a Chief who was allowed to serve less than four-and-one-half years. (*Id.* at 8–9.) In addition, plaintiff argues that he is seeking not only money damages, but specific performance as well. (*Id.* at 9.) Plaintiff argues that the documents gathered in the course of the "Dingledine Committee" review[3] are relevant to the terms of his employment. (*Id.* at 9–10.)

As to the issue of whether there are compensable damages if, as defendant contends, there was no automatic pay increase with a promotion to Division Chief, plaintiff argues (1) he is seeking specific performance because money damages would not make him whole, and (2) Drs. Martinez–Maldonado and Kokko represented to him during the time he was recruited that the compensation for Division Chiefs at Emory was among the highest in the country. (*Id.* at 12–13.) Plaintiff states that it was his understanding that upon being made Chief of Pulmonary, he would make what past Chiefs of Pulmonary had made, which was at least equal to, if not more than, what Chiefs of other Divisions made. (*Id.* at 13.) Plaintiff states that not only was he led to believe that he would be offered the position of Chief of Pulmonary, but also that he would earn a significantly higher salary if he accepted this position. (*Id.*) Plaintiff contends that this is an issue for the trier of fact.

Plaintiff argues that he should be permitted additional discovery on the salary issue, in particular, he should be provided with information on what other Division Chiefs make and what form their offers were in when they were promoted to Division Chief. (*Id.* at 15.) Plaintiff continues

to maintain, however, that even if there were no monetary damages, his claims should survive summary judgment because he also seeks specific performance. (*Id.* at 16.)

Defendant has filed a response, in which it argues that plaintiff failed to answer any of the Court's concerns. (Def. Emory Univ.'s Reply to Pl.'s Resp. to Ct.'s Feb. 13, 2001 Order [54].) First, defendant argues that plaintiff failed to rebut the Court's concern that the promissory estoppel claim fails as a matter of law because the position of Chief was an at-will position. (*Id.* at 1–2.) Second, defendant maintains that plaintiff failed to answer the Court's question as to how further discovery could assist plaintiff in his promissory estoppel claim. (*Id.* at 4.) Defendant argues that the real issue regarding this claim was the reasonableness of plaintiff's belief, and none of the disputed discovery requests are tailored to produce evidence relevant to this issue. (*Id.*) Third, defendant notes that although the Court did not even ask plaintiff to brief the issue, plaintiff argued that the discovery requests were also necessary for his breach of contract claim, but failed to show how any of the requested documents could support plaintiff's assertion that Dr. Kokko intended the April 1 and April 4 letters to form a contract. (*Id.* at 6.)

Specifically, defendant argues that plaintiff failed to show how the information sought in Document Request # 1, such as recruiting information on Drs. Aguayo and Roman, has any bearing on Dr. Kokko's intentions as to plaintiff's position. (*Id.*) Defendant also maintains that plaintiff failed to show how the information sought

---

brought a separate suit against Emory, not before this Court, regarding federal whistle blower laws.

3. A committee headed by Dr. Dingledine was convened to decide whether or not plaintiff had resigned from the faculty of the Emory School of Medicine. The committee concluded that he had not actually resigned.

in Document Request # 2, which relates to plaintiff's employment after he was hired, and Document Request # 4, which seeks employment records of all Emory faculty members in the Pulmonary Division, is relevant to the contract question. (*Id.* at 6–7.) Likewise, as to plaintiff's request for the hard drives of certain computers, defendant points out that plaintiff has failed to specify what information he intends to discover and how it relates to his promissory estoppel or contract claims. (*Id.* at 7.)

Lastly, defendant argues that plaintiff failed to explain to the Court the basis of any damages in relation to his breach of contract claim. (*Id.* at 8.) Defendant argues that the generalization made by plaintiff that Division Chiefs earn more than mere tenured professors is insufficient to show damages. In addition, defendant argues that specific performance is not an available remedy in a personal services contract case such as this. (*Id.* at 8 & n. 4.) Defendant argues that the pay information sought by plaintiff relating to what other professors and Division Chiefs make is irrelevant to the issue of whether there is any specific supplement or stipend associated with being promoted to Division Chief. (*Id.* at 9–10.) Without any evidence of damages, defendant argues, plaintiff's claim fails. (*Id.* at 10.)

## DISCUSSION

### I. Motion to Compel

In the Court's February 13, 2001 Order addressing plaintiff's discovery requests, the Court indicated its skepticism that more discovery would really further plaintiff's remaining claims. (Order [51].) Specifically, as to Count One, the Court noted: "If plaintiff can convince the Court

that he can survive defendants' motion for summary judgment on the contract claim, then perhaps more discovery is appropriate." As to Count Two, the Court stated, "[T]he Court cannot envision how more discovery would aid plaintiff in drafting his own motion for summary judgment or in responding to defendant's motion as to the issue of promissory estoppel." Having reviewed plaintiff's response to this Order, the Court concludes that plaintiff has failed to convince the Court that further discovery would assist the resolution of these two claims. As discussed in greater detail below, upon further consideration, the Court concludes that the two remaining claims fail as a matter of law.[4] Accordingly, no further discovery is required, and plaintiff's motion to compel and for sanctions is **DENIED**.

### II. Defendant's Motion for Summary Judgment

#### A. Breach of Contract

As discussed in this Court's earlier Order, there are two possible interpretations of the communications between plaintiff and Dr. Kokko in April 1991. Which of the interpretations applies depends on the impact of the following statement:

> You have stated that when I am promoted from assistant to associate professor, you will ask me if I would like to become the permanent chief of the [pulmonary] division. The challenge of having a leadership position at Emory during the years that you and Dr. Martinez are revitalizing the research strength of the Internal Medicine department is very appealing to me. This offer is the chief reason that I have decided to accept the Emory position over other opportunities.

4. As plaintiff's response to defendant's motion for summary judgment mirrors the legal arguments that he would make in his own motion for summary judgment, no purpose would be served by delaying resolution of this case to allow plaintiff to file a futile motion for summary judgment.

Again, I thank you for your confidence in me.

(Def.'s Mot. for Summ. J. [42] at Ex. 2.)

One explanation of this letter is that it was simply an acceptance of Drs. Kokko and Martinez–Maldonado's March 13 offer letter, and the language discussing the chief position does not modify a material term, but merely explains plaintiff's rationale for accepting the offer. Construed in this way, the contract would not have included the offer of promotion to Chief after obtaining tenure, and defendant would prevail.

If the language addressing the Chief position is construed as a modification, however, then plaintiff's letter constituted a counteroffer. Dr. Kokko's letter, although it speaks in terms of plaintiff's "acceptance," is most reasonably viewed as an acceptance of the counteroffer because Dr. Kokko states therein that he agrees with all aspects of plaintiff's letter. Assuming that the parties' contract did include an agreement that plaintiff would be asked, upon promotion to associate professor, whether he would like the position of Chief of Pulmonary, the question is whether plaintiff can state a viable claim for breach of contract. As discussed below, the Court concludes that the answer to this question is no. Therefore, the Court need not decide between the opposing interpretations of the April letter because plaintiff's claim fails under either.

The Court begins its analysis at a point of disagreement between the parties: if plaintiff was to be offered the position of Chief of Pulmonary, what was the nature of this employment? Defendant maintains that the position of Division Chief is an at-will position. Because he has obtained tenure, and claims to have been working under annual contracts prior to that time, plaintiff apparently feels that no part of his employment could be at will. Defendant has submitted the affidavit of Dr. Kokko

stating that appointment as Division Chief is for no set period of time and that the Division Chief can be removed by him at will. Plaintiff has presented no evidence to rebut this allegation. Plaintiff states only that he is under the *impression* that a Division Chief has never been removed against his will and that Division Chiefs are usually allowed to serve a period of years. The fact that other Division Chiefs have served for several years, however, does not rebut the proposition that they serve at the pleasure of the Chairman of the Department of Medicine (Dr. Kokko at all times relevant) and are removable at any time, despite the fact that they are all tenured professors. Likewise, plaintiff's expectation that the position would be for a period of years does not change the nature of the employment. *See Buchanan v. Foxfire Fund, Inc.,* 151 Ga.App. 90, 91, 258 S.E.2d 751, 752 (1979) ("That the contract reflects the parties' expectation that appellant would reside in the caretaker's house until his death will not supply definiteness to this otherwise indefinite contract.") Accordingly, the Court concludes that even if plaintiff were entitled to be asked whether he wanted to assume the position of Chief of Pulmonary, it is undisputed that the resulting position would have been an "at-will" position.

██ Georgia law specifically recognizes employment "at will." *See* O.C.G.A. § 34–7–1. The Georgia code specifies that "[a]n indefinite hiring may be terminated at will by either party." *Id.* Recognizing that Georgia law allows for the termination of at-will employment at the will of either party, Georgia courts have held that "a promise of employment for an indefinite term is insufficient to support a cause of action for breach of contract." *Jones v. Destiny Indus., Inc.,* 226 Ga.App. 6, 8, 485 S.E.2d 225, 227 (1997) (citing *Barker v. CTC Sales Corp.,* 199 Ga.App. 742(1), 406

S.E.2d 88 (1991)); *Johnson v. MARTA,* 207 Ga.App. 869, 869, 429 S.E.2d 285, 286 (1993) ("It is undisputed that Johnson's employment with MARTA was for an indefinite term, and for that reason was terminable at the will of the employer, with no resulting cause of action for breach of contract."); *Barker,* 199 Ga.App. at 742, 406 S.E.2d at 89 ("OCGA § 34–7–1 provides, inter alia, that '[a]n indefinite hiring may be terminated at will by either party,' and consequently Georgia courts have repeatedly held that a promise of employment for an indefinite term is insufficient to support a cause of action for breach of an employment contract."). *Pacrim Associates v. Turner Home Entertainment, Inc.,* 235 Ga.App. 761, 510 S.E.2d 52 (1998), cited by plaintiff, is inapplicable because the plaintiff therein claimed that the defendant had offered it a *one-year* licensing agreement.

The present case, however, is not on the exact same footing as the cases cited above because the employees in those cases had already commenced employment while Dr. Murtagh was never appointed Division Chief. The alleged contract to appoint Murtagh to Division Chief can be viewed in two ways. First, it could be a promise to promote. If the agreement is viewed in this light, plaintiff's claims are squarely barred by Georgia case law. *See Moore v. Bellsouth Mobility, Inc.,* 243 Ga.App. 674, 676, 534 S.E.2d 133, 135 (2000); *Alston v. Brown Transport Corp.,* 182 Ga.App. 632, 356 S.E.2d 517 (1987).

The agreement could also be viewed as a promise of future employment upon the satisfaction of a condition subsequent: that is, an offer of employment as Division Chief once plaintiff acquired tenure. Whether viewed as an agreement to promote or an agreement to hire at a future date, the controlling factor is still the issue of at-will employment. The parties have not cited a Georgia case, and the Court has been unable to find one, addressing the effect of a revocation of an offer for at-will employment under Georgia law. Nonetheless, this Court concludes that if presented with the issue, Georgia would follow the majority of jurisdictions having considered this issue and hold that there is no cause of action when the offer of employment was for an at-will position. *See, e.g., Sakelaris v. Rice/Maddox Partnership,* 883 F.Supp. 64 (D.S.C.1995); *White v. Roche Biomedical Labs., Inc.,* 807 F.Supp. 1212 (D.S.C.1992); *Slate v. Saxon, Marquoit, Bertoni & Todd,* 166 Or.App. 1, 999 P.2d 1152 (2000); *Leonardi v. City of Hollywood,* 715 So.2d 1007 (Fla.Dist.Ct.App. 1998); *Bonczek v. Carter–Wallace, Inc.,* 304 N.J.Super. 593, 701 A.2d 742 (App.Div. 1997); *Doe v. SmithKline Beecham Corp.,* 855 S.W.2d 248 (Tex.App.1993); *Alfano v. AAIM Mgmt. Assoc.,* 770 S.W.2d 743 (Mo. Ct.App.1989). *But see Comeaux v. Brown & Williamson Tobacco Co.,* 915 F.2d 1264 (9th Cir.1990) (allowing "reliance damages" for rescinded job offer under contract theory); *Bower v. AT & T Techs., Inc.,* 852 F.2d 361 (8th Cir.1988) (allowing recovery for rescinded job offer under promissory estoppel but not breach of contract).

The courts that have found recovery for the revocation of a job offer barred by the "employment at-will" doctrine have generally based their holdings on the theory that the employer could have fired the employee as soon as he began working, so the employer should be able to fire him before he starts working. In *Slate,* for example, the court held:

> In our view, it would be completely illogical to hold that an employer is exposed to liability if it invokes the right to terminate at will before the employee begins working but is absolved from liability if it defers doing so until immediately after the employee reports for

work. In addition to being illogical, such a holding would also be most undesirable in its consequences. It would serve the interests of no one—least of all new professional persons in search of work—to discourage putative employers from discharging them earlier rather than later, under circumstances where there is no possibility that an actual employment relationship will ever exist. 999 P.2d at 1154. *See also Doe,* 855 S.W.2d at 254 ("We see no reason to place greater contractual duties on Quaker in a pre-employment situation.").

██ As Georgia courts have so strongly defended the concept of at-will employment in the employment context, this Court concludes that Georgia courts would reach the same decision as the courts in *Slate* and *Doe* if faced with the issue of how to treat a revoked job offer for at will employment. It simply would make no sense for plaintiff to have a cause of action when he was never appointed Chief of Pulmonary if he would have no claim had he been appointed, then demoted an hour later. While plaintiff may claim that he would have preferred the latter, on a commonsense basis, this is nonsensical. The Court is quite certain that the impact on plaintiff's career would be the same, if not

more detrimental, for plaintiff to have been the Chief for a day. Regardless, the real issue is that, under the at-will doctrine, plaintiff cannot state a claim for breach of contract in Georgia where the position allegedly promised was for no specified or guaranteed period of time. The Chief position was clearly at-will, and, accordingly, plaintiff's breach of contract claim fails. Defendant's motion for summary judgment as to this claim is **GRANTED.**[5]

### B. *Promissory Estoppel*

██ Plaintiff's remaining claim is for promissory estoppel. Plaintiff claims that he reasonably relied, to his detriment, on Dr. Kokko's promise to offer him the Chief of Pulmonary position upon promotion to associate professor. Plaintiff claims that if not for this promise, he would not have accepted the Emory position and would have either gone to Baylor or remained at NIH. Defendant argues that this claim fails as well because, under Georgia law, the doctrine of promissory estoppel does not apply when the promise allegedly relied upon is for employment of an indefinite period of time. (Emory Univ.'s Mem. of Law in Supp. of Mot. for Summ. J. [42] at 10.) Defendant cites several cases in-

---

**5.** Defendant's second argument, after contending that there was no contract addressing the chief position, is that even if there were a contract, plaintiff has adduced no actual damages. Defendant contends that even if plaintiff could establish a breach of contract, he could recover only nominal damages under O.C.G.A. § 13-6-6 ("In every case of breach of contract the injured party has a right to damages, but if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action."). Defendant bases this argument on the fact that there is no evidence that plaintiff was guaranteed a particular salary upon promotion to Division Chief. (Emory Univ.'s Mem. of Law in Supp. of Mot. for Summ. J. [42] at 19.)

The Court agrees. Plaintiff has admitted that there was no particular raise or stipend associated with promotion to Division Chief. He merely relies on the fact that in most circumstances, the Division Chief made substantially more than other faculty members in the Division. This may be true, but it appears more related to the Division Chief's success and seniority at Emory, than directly correlated to a salary tied to the position.

Clearly, plaintiff has had his difficulties at Emory, and it is just too speculative to assume as a fact that he would have been paid the same as past Chiefs of the Pulmonary Division. Accordingly, if plaintiff had been able to prevail in stating a claim for breach of contract, at most, he would have been entitled to nominal damages only.

volving promises of employment, but argues that the same reasoning would apply to a promise to promote. (*Id.* at 11.) Plaintiff argues that these cases have no bearing on the present case because he worked under a contract at all times and was never an at-will employee. Again, plaintiff confuses the issue. The fact that his underlying academic employment was contractual does not change the fact that the position of Chief of Pulmonary is indisputably an at-will position.

Again, just as with the contract claim, whether viewed as a promise to promote to an at-will position or as a promise for future at-will employment, plaintiff's claim is barred because the Chief position was for no guaranteed period of time. There is ample Georgia case law to the effect that one cannot state a claim for promissory estoppel when the underlying promise is for at-will employment. *See Jones*, 226 Ga.App. at 8, 485 S.E.2d at 227 ("Promissory estoppel has no application in the instant case where the promise relied on, if any, was for employment or an agency relationship for an indefinite period of time."); *Simpson Consulting, Inc. v. Barclays Bank PLC*, 227 Ga.App. 648, 658, 490 S.E.2d 184, 193 (1997) ("In the case sub judice, as a matter of Georgia public policy, appellants have no cause of action under the Georgia equity doctrine of promissory estoppel as to any alleged contracts terminable at will."); *Johnson*, 207 Ga. App. at 870, 429 S.E.2d at 287 ("The doctrine of promissory estoppel codified at OCGA § 13–3–44(a) has no application to enforce executory promises pertaining to employment for an indefinite term.");

*Barker*, 199 Ga.App. at 743, 406 S.E.2d at 90 (" 'this principle has no application in the instant case where the promise relied on was for employment of an indefinite period' "). Because Dr. Kokko could have terminated plaintiff as soon as he was appointed to the position of Chief of Pulmonary, plaintiff's reliance on such a promise was unreasonable and insufficient to support a claim for promissory estoppel. Accordingly, defendant's motion for summary judgment is **GRANTED** as to this claim as well.[6]

### CONCLUSION

For the foregoing reasons, plaintiff's Motion to Compel Discovery or for Sanctions [30] is **DENIED**, plaintiff's Motion for Enlargement of Time [43] is **GRANTED**, the Consent Motion for Enlargement of Time to Respond to Defendants' Motion for Summary Judgment [46] is **GRANTED**, and defendant Emory University's Motion for Summary Judgment [42] is **GRANTED**.

---

**6.** Defendant puts forth two further arguments in support of its position that the promissory estoppel claim fails: (1) plaintiff did not rely "to his detriment" on Dr. Kokko's alleged promise because plaintiff's offer at Baylor was no better than the offer at Emory and (2) plaintiff's reliance on Dr. Kokko's word was unreasonable because plaintiff had been told that Dr. Kokko could be untrustworthy. (Emory Univ.'s Mem. of Law in Supp. of Mot. for Summ. J. [42] at 12–16.) As the Court has concluded that plaintiff's claim fails because of the at-will character of the Division Chief position, it need not address these alternative arguments.